[No. 14291-7-I. Division One. March 31, 1986.]

WILLIAM J. HONCOOP, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

TONY VELTHUIZEN, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, *Respondent.*

TONY VELTHUIZEN, ET AL, *Appellants,* v. HAROLD HOLLOWAY, ET AL, *Defendants,* THE STATE OF WASHINGTON, *Respondent.*

302

*Bricklin & Gendler, David A. Bricklin, Simonarson, Visser, Zender, Brandt & Thurston, Hal Thurston,* and *Jerry Schumm,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Narda Pierce, Assistant,* for respondents.

SCHOLFIELD, C.J.—Appellants appeal a grant of summary judgment dismissing their negligence claims. The State cross–appeals an order finding that although the 2–year statute of limitations applied to appellants' claims, the discovery rule was also applicable.

### FACTS

Appellants are 10 dairy operators whose herds became infected with brucellosis, a contagious bovine disease. Respondents are the State of Washington, a former and present director of the State Department of Agriculture, and two former state veterinarians.

Brucellosis (also known as "Bang's disease") is a highly contagious disease that infects cattle and other domestic and wild animals. An infected animal shows no outward physical signs of the disease. The only clinical sign is abortion in pregnant cows. Cattle commonly become infected by eating or licking contaminated aborted matter.

Humans may also contract the disease, which is commonly known as "undulant fever." Transmission to humans most frequently occurs through contact with the tissues, blood, urine, or aborted matter of infected animals. The disease may also be contracted by ingesting unpasteurized milk or cheese from infected animals. The disease is most commonly contracted by occupational workers, *e.g.,* farm

workers, veterinarians, and slaughterhouse workers.

Washington entered into a cooperative brucellosis control and eradication program with the federal government. This program involved health requirements for the importation of cattle into Washington, the testing of herds, and the slaughtering of cattle that reacted to the test for brucellosis as set forth in the USDA publication, *Brucellosis Eradication: Uniform Methods and Rules.* The program also involved calf vaccinations, with the state providing the vaccine and the USDA paying veterinarians to administer it.

During the 1950's, the number of reported cases of undulant fever in Washington was relatively high—over 200. By 1966, brucellosis had been virtually eliminated in Washington, and the state was certified as brucellosis–free. The USDA discontinued vaccination subsidization, and calf vaccinations dropped sharply. Until 1976, the state experienced only isolated incidents of brucellosis infection. However, in 1976, 10 herds in Whatcom County and elsewhere became infected. In 1977, 19 herds became infected.

On April 22, 1977, the director of Washington's Department of Agriculture issued Emergency Order 1525,[1] requiring that all imported cattle be tested negative to brucellosis within 30 days prior to importation, that they be quarantined on arrival, that they be retested not less than 30 days nor more than 60 days after arrival, and that all breeding cattle be tested negative to brucellosis upon sale (change of ownership) within the state.

To carry out the brucellosis testing, cattle saleyards employed veterinarians to perform a "screening test"[2] upon cattle to be sold, drawing blood and sending samples to the state laboratory for testing. These veterinarians were authorized by the Director of Agriculture to issue quarantines

---

[1]The record on appeal does not contain Emergency Order 1525. However, because both parties acknowledge its issuance, we do not question its existence.

[2]These sale/change of ownership tests were discontinued on August 16, 1977, at the request of some cattlemen, saleyard veterinarians, and saleyard operators because only 16 reactors had been disclosed out of approximately 28,000 tested.

upon animals that reacted positively to the screening test.

RCW 15.36.150 and WAC 16–86–040 delineate the statutory scheme for eradicating brucellosis. The results of the blood tests at the state laboratory are submitted to the state veterinarian, who considers them in light of the test history of the particular animal and the history of infection in the particular herd and classifies the animal as either a "negative", a "suspect", or a "reactor". If the animal is classified as a "reactor", it must be slaughtered within 15 days. The herd of cattle to which the reactor belonged must also be quarantined. This quarantine lasts until the entire herd has passed two consecutive negative blood tests without reactors, the first test not less than 30 days following removal of the reactor from the herd, and the second test not less than 90 days after the first test. Reactor classification "shall be based on standards listed in 'U.S. Department of Agriculture Uniform Methods and Rules for Brucellosis Eradication.'" WAC 16–86–040(1).

This statutory scheme is commonly referred to as the "test and slaughter" method. An accessory to this method is total herd depopulation, the slaughtering of both diseased and nondiseased animals. When successive herd tests indicate an ever–increasing number of brucellosis reactors, and the herd poses a threat of infection to neighboring herds, depopulation may be recommended to the herd owner. A herd owner must agree to depopulate, and the USDA and the state veterinarian must approve a depopulation before indemnities will be paid to the owner.

All of the appellants traced the infection in their herds directly or indirectly to Harold Holloway, a cattle dealer who imported dairy cows from Idaho. Velthuizen, Heutink, Megard, Speelman, Rupke, and Hilverda purchased cows from Holloway at auctions in Washington in 1977 and 1978. Ruzicka and Heida contend that their herds were infected through contact with neighboring herds that had been infected by cows purchased from Holloway. Honcoop and Zylstra contend that their herds were infected through being transported by Vanderveen, who also transported

infected Holloway cows.

Each appellant was advised of the presence of a brucellosis reactor in their herd as follows:

| | |
|---|---|
| Honcoop | December 1977 |
| Megard | January 1978 |
| Heutink | May 1978 |
| Velthuizen | June 1978 |
| Rupke | August 1978 |
| Zylstra | November 1978 |
| Heida | February 1979 |
| Speelman | April 1979 |
| Ruzicka | May 1979 |
| Hilverda | August 1980 |

Velthuizen, Heutink, and Megard filed separate complaints against Harold Holloway in Lewis County in August 1978. Honcoop, Zylstra, Heida, Ruzicka, Speelman, Rupke, and Hilverda filed suit against the State in December 1980. Velthuizen and Heutink filed against the State in Whatcom County in May 1981. Honcoop, et al, filed a second amended complaint adding the four state employees, Holloway, and a cattle hauler, Vanderveen, as defendants, in July 1981.

On May 27, 1982, all of the above actions were consolidated in Whatcom County Superior Court. Megard then amended his complaint to name the State of Washington in June 1982. Appellants alleged causes of action for negligence, abuse of police powers, taking of property without adequate compensation, taking of property without due process, and violation of 42 U.S.C. § 1983.

On January 3, 1983, the trial court entered partial summary judgment, dismissing the claims for abuse of police powers, the "taking" claims, and the claim under 42 U.S.C. § 1983. The trial court also dismissed the cause of action for negligent policies, programs, and practices regarding adult and calfhood vaccinations. The court held that the 2-year statute of limitations in RCW 4.16.130 applied regarding the failure of public officials to perform their official

duties. Finally, the trial court ordered the appellants to file detailed statements of their remaining negligence claims.

Velthuizen, Heutink, and Megard filed a statement of 26 allegations of the State's negligence concerning its supervision of the brucellosis testing program. Honcoop and the other six filed a somewhat less detailed statement of allegations of the State's negligence.

On March 9, 1983, the trial court applied the public duty doctrine to the remaining negligence claims and granted summary judgment dismissing the appellants' complaint. Apparently anticipating the possibility that the claims could be reinstated on appeal, the court also entered an order finding that the claims of Honcoop, Rupke, Velthuizen, Heutink, and Megard were not barred by the statute of limitations because the discovery rule applied, and the date of the discovery of their causes of action should be left to the trier of fact.

### Statute of Limitations

Concerning the statute of limitations applicable to the appellants' claims against the State, RCW 4.16.080(2) places a 3–year statute of limitations upon:

> An action for taking, detaining, or injuring personal property, including an action for the specific recovery thereof, or for any other injury to the person or rights of another not hereinafter enumerated;

RCW 4.16.130 states that:

> An action for relief not hereinbefore provided for, shall be commenced within two years after the cause of action shall have accrued.

In *Northern Grain & Warehouse Co. v. Holst,* 95 Wash. 312, 163 P. 775 (1917), the Washington Supreme Court held that the 2–year statute of limitations applied to any action based *indirectly* upon the failure of public officers to perform their duties. *Northern Grain,* at 319. The court interpreted the 3–year statute of limitations to apply only to certain direct invasions or injuries to the "rights of another".

■ Progeny of *Northern Grain* continued to utilize the direct/indirect distinction with respect to tort claims. However, in *Stenberg v. Pacific Power & Light Co.*, 104 Wn.2d 710, 709 P.2d 793 (1985), the Washington Supreme Court expressly overruled the direct/indirect distinction. Both *Stenberg* and its companion case, *Schroder v. County of Klickitat,* concerned injuries resulting from automobile accidents. The court held that RCW 4.16.080(2) applies to causes of action claiming both direct and indirect injuries to the person or rights of another. *Stenberg,* at 711.

Although the facts in *Stenberg* concerned injury to the person, RCW 4.16.080(2) also deals with injury to personal property. Therefore, we hold that the 3-year statute of limitations is applicable to the negligence claims of the appellants.

Appellants Heida, Heutink, Hilverda, Honcoop, Rupke, Ruzicka, Speelman, Velthuizen, and Zylstra all commenced their lawsuits within 3 years following the discovery of a reactor cow in their herds. Thus, their actions are timely, without need to apply the discovery rule.

However, appellant Megard commenced his action against the State more than 3 years after discovering a reactor cow. Megard argues that he did not discover his cause of action against the State until he obtained certain documents from the United States Department of Agriculture pursuant to Freedom of Information Act requests in early 1981.

■ The general rule is that a cause of action accrues and the statute of limitations begins to run when a party has the right to apply to the court for relief. *U.S. Oil & Ref. Co. v. Department of Ecology,* 96 Wn.2d 85, 91, 633 P.2d 1329 (1981). The discovery rule is an exception under which a cause of action accrues, and the statute of limitations does not begin to run until the plaintiff learns of, or in the exercise of reasonable diligence should have learned of, the facts which give rise to the cause of action. *U.S. Oil,* at 92.

The question of when Megard discovered his cause of action for the purposes of the statute of limitations is a

question of fact. Therefore, the determination of whether the Megard action was timely must await further fact-finding by the trial court.

PUBLIC DUTY DOCTRINE

A summary judgment motion may be granted

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c). *See also Herskovits v. Group Health Coop.*, 99 Wn.2d 609, 613, 664 P.2d 474 (1983).

■ On review of an order granting summary judgment, the appellate court must "engage in the same inquiry as the trial court." *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). The court must consider the evidence in the light most favorable to the nonmoving party. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*, 81 Wn.2d 528, 530, 503 P.2d 108 (1972). The burden is on the moving party to "prove by uncontroverted facts that there is no genuine issue of material fact." *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977).

Analysis of the trial court's summary judgment order requires the examination of whether the public duty doctrine applies, mandating a finding that the State is entitled to summary judgment as a matter of law. If not, do material issues of fact regarding the State's negligence remain, precluding summary judgment?

■ In 1967, the Legislature adopted RCW 4.96.010,[3] which waived sovereign immunity. Subsequently, the

---

[3]RCW 4.96.010 provides:

"All political subdivisions, municipal corporations, and quasi municipal corporations of the state, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers, agents or employees to the same extent as if they were a private person or corporation: *Provided,* That the filing within the time allowed by law of any claim required shall be a condition precedent to the maintaining of any action. The laws specifying the content for such claims shall be liberally construed so that substantial compliance therewith will be deemed satisfactory."

Washington Supreme Court adopted the "public duty doctrine", which provides that if the duty breached by a governmental entity was merely the breach of an obligation owed to the public in general, then a cause of action would not lie for any individual injured through the breach of that duty. 18 E. McQuillin, *Municipal Corporations* § 53.04(b), at 165 (3d rev. ed. 1984).

### LEGISLATIVE INTENT EXCEPTION

■ Certain exceptions to the public duty doctrine have been recognized. The first of these exceptions creates a duty on the part of the municipal corporation if a statute or ordinance indicates a clear legislative intent to protect a specified class of persons, and the plaintiff is a member of that class. *See Halvorson v. Dahl,* 89 Wn.2d 673, 574 P.2d 1190 (1978).

In *Mason v. Bitton,* 85 Wn.2d 321, 534 P.2d 1360 (1975), the State was held liable for a death resulting from a high-speed police chase. A state statute authorized a law enforcement officer to exceed the speed limit "so long as he does not endanger life or property". RCW 46.61.035(2)(c). It also provided that the driver bears "the duty to drive with due regard for the safety of all persons" and shall not be protected "from the consequences of his reckless disregard for the safety of others." RCW 46.61.035(4). The court held that this language created a statutory duty to protect "all persons" and supported governmental liability. *Mason,* at 325–26.

In *Halvorson v. Dahl, supra,* the court noted that although most codes are enacted merely to protect the *public* safety and the *general* welfare, the Seattle Housing Code identified conditions dangerous to the health and welfare, not only of the public, but also of the *occupants of the buildings.* Section 27.04.020 of the code also set forth as a purpose the "effective means for enforcement" of minimum standards. The court held that the code was enacted to benefit a specified group of persons as well as the general public.

In *Baerlein v. State*, 92 Wn.2d 229, 595 P.2d 930 (1979), the court held that a portion of the Securities Act of Washington and an administrative code regulation adopted pursuant to that act limited the duty of the State, rather than identified a benefited class. RCW 21.20.360 disclaims responsibility for the truth of a registration statement; WAC 308–132–010(1) disclaimed liability for apparent approval of misleading or deceptive advertising. The court noted that the securities division staff consisted of two people, who issued 2,000 securities permits over the relevant year. The court determined that legislative intent was only to provide some protection to the investing public.

Honcoop, et al, cite former RCW 16.40.010:

> The director of agriculture of the state shall cause all bovine animals within the state to be examined and tested for the presence or absence of tuberculosis and/or Bang's disease, and such other tests necessary *to prevent the spread of communicable diseases among livestock.*

(Italics ours.) They also cite former RCW 16.36.020:

> The director of agriculture shall have general supervision of the prevention of the spread and the suppression of infectious, contagious, communicable and dangerous diseases affecting the *domestic animals . . .*

(Italics ours.) Finally, they also cite RCW 16.38.010:

> The production of livestock is one of the largest industries in this state; and whereas livestock disease constitutes a constant threat to the public health and the production of livestock in this state; and whereas the prevention and control of such livestock diseases by the state may be best carried on by the establishment of a diagnostic service program for livestock diseases; therefore it is in the public interest and for the purpose of protecting health and general welfare that a livestock diagnostic service program be established.

The State cites RCW 16.36.096, which provides in part:

> The director of agriculture, *in order to protect the public health and welfare,* may enter into cooperative programs with the federal government or agencies thereof for the prevention or eradication of any contagious, infectious, or communicable disease which is affecting or

which may affect the health of the animal population of this state.

(Italics ours.)

These statutes do not identify a special class of persons to be protected in addition to the general public. The standard of review here is *clear* legislative intent. The language of RCW 16.38.010 and 16.36.096 delineates the Legislature's concern to protect the public interest.

The appellants argue that in April 1977, the Washington Department of Agriculture issued Emergency Order 1525, amending WAC 16-54-080, regarding brucellosis testing of imported cattle, and they also claim that an open letter was sent to the livestock industry regarding the State's role in fighting brucellosis. From our review of the record, we find that neither of these documents was before the trial court below. Therefore, we decline to rule on the question of whether administrative regulations and pronouncements are in any way indicative of legislative intent. We conclude that the circumstances here do not constitute an exception to the public duty doctrine based upon legislative intent.

SPECIAL RELATIONSHIP EXCEPTION

The second exception to the public duty doctrine is the "special relationship exception". This exception develops when the interactions of the tort victim and the governmental entity create a special relationship between them, such that the State acquires a duty to the victim.

In *Campbell v. Bellevue,* 85 Wn.2d 1, 530 P.2d 234 (1975), a wrongful death action was instituted against the City of Bellevue by the widower of a woman who died after falling into an electrified stream near her home. Campbell alleged that agents of the City of Bellevue negligently enforced pertinent electrical codes.

The evidence indicated that prior to Mrs. Campbell's fatal accident, a Bellevue city employee inspected the stream, informed the property's caretaker of the corrective action required, and assured the Campbells through a conversation with another neighbor that the situation had been

corrected. The court noted that

> where a relationship exists or has developed between an injured plaintiff and agents of the municipality creating a duty to perform a mandated act for the benefit of particular persons or class of persons, then tort liability may arise.

*Campbell*, at 10. The court held that the City of Bellevue was subject to suit in tort for the death of Mrs. Campbell.

In *Chambers–Castanes v. King Cy.*, 100 Wn.2d 275, 669 P.2d 451 (1983), two men began assaulting the plaintiffs. The police were called 11 times until they arrived 1 hour 20 minutes later. Some of the plaintiffs' calls were met with express assurances from police dispatchers that help was on the way. Plaintiffs sued the County for negligent and intentional infliction of emotional distress. The court delineated the "special relationship" test as (1) whether there is some form of privity between the State's agent and the victim that sets the victim apart from the general public and (2) whether there are explicit assurances of protection that give rise to reliance. The court added that the word "privity" is used in the broad sense and refers to a relationship with any "reasonably foreseeable plaintiff". *Chambers–Castanes*, at 286. Further, the court noted that assurances are not always necessary because some relationships carry the implicit character of assurance. The court held that the conversations with the dispatchers established privity and reliance, such that King County owed a duty to the Chambers–Castaneses.

In *J & B Dev. Co. v. King Cy.*, 100 Wn.2d 299, 669 P.2d 468 (1983), a developer contacted the building department and was issued a building permit. The official failed to notice that the plan did not provide for the required setback. A later inspection was done in which the setback error was not detected. The court held at page 306 that a "special relationship" had been established. The developer had had direct contact with the County's agents and was justified in relying on the permit and inspection without express assurances.

Applying the special relationship test to the case before the court, we find that only two of the appellants' circumstances rise to the level of special relationships. Only Heutink and Megard allege in their affidavits that they were contacted by the State for brucellosis testing on their farms. Each stated that following negative results from the testing of his herd, he was "[l]ed to believe . . . that [he] had no brucellosis problem . . . and . . . should not take any special precautions."

These circumstances fulfill the requirements of the special relationship test. The necessary privity between the State and these appellants set them apart from both the general public and other cattle owners. Secondly, the assurances given to both Heutink and Megard that they need not be concerned about brucellosis in their herds gave rise to reliance by Heutink and Megard.

Although the other appellants claim they relied on the State to enforce the brucellosis testing program and thereby eradicate the disease, none of them shows the required privity to give rise to a duty on the part of the State.

Velthuizen avers that he was aware that the State was establishing stricter requirements for importing and selling of dairy cattle. However, he admits that he was never contacted by any representatives of the State.

Honcoop, Zylstra, Heida, Ruzicka, Speelman, Rupke, and Hilverda allege that the State took charge of prevention and control of brucellosis and supervised and regulated cattle sales. They do not allege that they were directly contacted in any way by the State such that they were set apart from the general public.

The circumstances of Heutink and Megard fall under the "special relationship" exception to the public duty doctrine, permitting them to claim in tort against the State.

Examining the allegations of negligence in the light most favorable to the appellants Heutink and Megard, we find that material issues of fact remain concerning the State's negligence, precluding summary judgment.

### Third Party Relationships

Recent Washington cases have discussed the State's duty based on the relationship between the State and the *tortfeasor*. In *Petersen v. State,* 100 Wn.2d 421, 671 P.2d 230 (1983), the victim of a car accident caused by the reckless driving of a mental patient released from Western State Hospital brought suit against the state psychiatrist who released the driver. The Washington Supreme Court held that a "special relation" exists between a psychiatrist and a patient he knows to be dangerous, giving rise to an affirmative duty to take reasonable precautions to protect anyone who might foreseeably be endangered by the premature release of that patient. *Petersen,* at 428. *Petersen* appears to establish a third exception to the public duty doctrine.

In *Bailey v. Forks,* 38 Wn. App. 656, 688 P.2d 526 (1984), *review granted,* 103 Wn.2d 1012 (1985), a person injured in an accident involving an intoxicated driver sought damages from a municipality, claiming that its police officer was negligent for failing to prevent the intoxicated driver from proceeding in his vehicle. Disallowing the liability of the municipality, the Court of Appeals distinguished *Petersen* on two grounds. First, the court determined that no language in the *Petersen* opinion discussed the public duty doctrine, and the Court of Appeals declined to so interpret the *Petersen* holding. Secondly, the *Bailey* court determined that the relationship between the officer and the tortfeasor was too "tenuous and unsubstantial to warrant application of any such exception". *Bailey,* at 663.

Citing several cases which have construed Restatement (Second) of Torts § 315 (1965), the *Bailey* court noted that the relationship between a third party defendant and the tortfeasor must be a "definite, established and continuing relationship" to impose liability. *Bailey,* at 664. *See Petersen v. State, supra; Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976).

Subsequently, in *Hartley v. State,* 103 Wn.2d 768, 698 P.2d 77 (1985), the Supreme Court determined that its holding in *Petersen* was relevant to the public duty doc-

trine issue and that the State was in a "special relationship" with the psychiatric patient who was the tortfeasor. *Hartley,* at 783.

However, the Supreme Court declined to extend its reasoning in *Petersen* to the facts in *Hartley.* In *Hartley,* the husband and children of a woman killed in an automobile accident involving an intoxicated driver sought damages from the State for its failure to revoke the driver's operator's license, despite the fact that he was a habitual traffic offender. The court held that no special relationship existed between the government agents and the driver, nor was the driver under the control of government agents who knew of his "dangerous proclivities". *Hartley,* at 785.

■ Although, in the case before the court, appellants argue that the State's duty to control a "dangerous animal" (*i.e.,* an animal with brucellosis) is analogous to the State's duty to confine a dangerous mental patient, thus giving rise to liability, this argument must fail. "Special relationships" refer to relationships between people. The relationship between the State Department of Agriculture and Holloway was not one of direct control, nor could it be said to be of an established and continuing character. Additionally, the recognition of the State's duty to an individual, based on the State's relationship to the tortfeasor, has to date been narrowly limited to medical and/or custodial circumstances. We decline to extend the *Petersen* rationale beyond such circumstances.

Thus, the public duty doctrine applies to appellants' negligence claims, precluding State liability to them as individuals, with the exception of appellants Heutink and Megard.

### DUE PROCESS HEARING

The appellants contend they are entitled to an award of damages because they were denied a post–slaughter hearing at which the State would be required to prove that the animals were diseased. The appellants allege further that the tests used by the State to determine brucellosis reactors

were unreliable. The appellants appear to suggest that the State had an obligation to go beyond the determination of whether a particular animal was a brucellosis reactor and had a duty to decide whether the animal was *actually* diseased.

The State concedes that the appellants had the right to a post–deprivation hearing, but it contends that the issue at such a hearing would *not* be whether the animals were actually diseased, but rather whether the State had properly applied the statute requiring slaughter of brucellosis reactors.

In *North Am. Cold Storage Co. v. Chicago*, 211 U.S. 306, 53 L. Ed. 195, 29 S. Ct. 101 (1908), the Court upheld the right of a state to seize and destroy dangerous food, holding that a post–deprivation hearing is adequate to afford due process. *North American Cold Storage*, at 316. The Court favorably cited *Lawton v. Steele*, 152 U.S. 133, 38 L. Ed. 385, 14 S. Ct. 499 (1894), which held that the state's burden is to prove a "justification under the statute." *North American Cold Storage*, at 317.

Former RCW 16.40.060 provided that

> no bovine animal shall be condemned for Bang's disease unless it has been subjected to a blood agglutination test . . . and a positive reaction for Bang's disease has resulted.

Because the appellants do not contend that their animals were condemned without being tested, but rather complain of the reliability of the tests performed, this court cannot sustain the claim of a due process violation.

Based on the foregoing analysis, we reverse the trial court's order granting summary judgment to the State of Washington with respect to the negligence claims of Heutink and Megard and remand for trial. We affirm the trial

court's order with respect to all other claims raised by the parties.

SWANSON, J., concurs.[4]

Reconsideration denied June 26, 1986.

Review by Supreme Court pending January 30, 1987.

---

[4]Judge Corbett had indicated his concurrence prior to his death February 8, 1986.