[No. 7709-8-III.   Division Three.   May 28, 1987.]

JOHN CHAMPAGNE, ET AL, as *Guardians, Appellants,* v. THE SPOKANE HUMANE SOCIETY, ET AL, *Respondents.*

*John H. Loeffler* and *Olson, Loeffler & Landis,* for appellants.

*Jonathan C. Rascoff,* for respondents.

MUNSON, J.—John and Roxie Champagne brought this action on behalf of their minor son, John, against the Spokane Humane Society for personal injuries resulting from the attack on John by a dog (a pit bull). The trial court dismissed the claim on summary judgment holding the action against the Society was barred by the public duty doctrine.

The Champagnes appeal, contending the trial court erred in granting summary judgment because (1) the public duty doctrine is inapplicable—the Society is not a governmental entity and (2) if the public duty doctrine applies, the circumstances are such that they fall within an exception to the rule. Holding the public duty doctrine applies, we reverse and remand; genuine issues of material fact exist as to whether the Champagnes fall within an exception to that doctrine.

The following facts are undisputed. On February 19, 1982, John Champagne, then age 5, was riding his tricycle in the alley behind his house. A pit bull dog owned by Dale Mason, a neighbor of the Champagnes, brutally attacked John.[1] As a consequence of the attack, John suffered massive tissue and bone loss to his right foot and ankle, necessitating eight operations. The dog was captured and ultimately destroyed.

At the time of the attack, the Society was under contract with the City of Spokane to supply all animal control services and to enforce the animal regulatory provisions of the Spokane city ordinances. Spokane city ordinance C13835

---

[1] Mr. Mason subsequently disappeared and is not a party to this action.

provides in pertinent part:

Section 1. Dogs at Large. It shall be unlawful for any person to cause, permit, or allow any dog or dogs, owned, harbored, controlled or kept by him, in the City of Spokane, to roam, run or stray away from the premises where the same is or are owned, harbored, controlled or kept . . .

. . .

Section 7. Impounding Agency. The Spokane Humane Society, a corporation, is hereby designated and authorized as the agency for the impounding of a dog or dogs as provided in this ordinance and the enforcement of the provisions thereof. . . .

Section 8. Impounding. Any dog or dogs found without a license or running at large in violation of the provisions of this ordinance, may be impounded by the Animal Regulatory Officers of the City of Spokane or officers of the Spokane Police Department or such other persons or agency as may be designated . . .

Paragraph 4 of the Society's contract with Spokane states in part: "The Society shall be responsible for the enforcement of all animal regulatory ordinances . . ."

Though disputed in part, the affidavits, declarations, exhibits, and pleadings tend to support the remaining facts. Mr. Mason (and his two pit bulls) moved into the Champagne neighborhood in the fall of 1981. Soon after, the Champagnes and other neighbors began complaining to the Society about these dogs roaming unleashed throughout the neighborhood. The Society's records reveal it received many complaints about the pit bulls from September 26, 1981 until February 18, 1982, 1 day prior to the attack. Likewise, the Society's records generated from citizen complaints demonstrate the Society knew the pit bulls' owner (Mr. Mason) resided at N. 4418 Stevens Street.

The Society had been advised of these pit bulls' aggressive natures and vicious propensities. The affidavit of Delia Peters, a neighbor of the Champagnes, states she called the Society to complain about the dogs' "harassment" on at least three separate occasions in January 1982. Her affidavit provides that on one occasion she witnessed the pit bulls

threatening a neighbor. On another occasion, she states: "The dogs . . . chased and threatened my husband and myself in our yard." Upon registering her complaint with the Society, she claims she was told that pit bulls were not dangerous.

The affidavit of Judy Lacerte, another neighbor, provides: "On one occasion, one of the pit bull dogs forced me to jump inside of my car to avoid being bitten." Her affidavit continues: "The two pit bull dogs were, in my opinion, vicious animals and I was afraid for my safety when I encountered these dogs." She further claims she called the Society four to six times prior to John's attack in order to complain of the dogs' behavior. On one occasion, she was advised she would have to capture the dogs herself before the Society could enforce the leash law. Her affidavit states she was unwilling to attempt the dogs' capture, because of their vicious nature.

Finally, Mrs. Champagne's affidavit provides she called the Society at least 10 times, informing it of the pit bulls' vicious natures. The Society's records show she called the day before the attack to complain about the dogs running loose.[2] Her affidavit further provides: "I was *assured* that the Humane Society would patrol the area and apprehend any stray dogs." (Italics ours.) In fact, the dogs were not apprehended until February 20, 1982, the day after the attack when Mr. Mason was ordered to deliver the pit bulls to the Society so they could be quarantined.

---

[2]Although the Society's record of her telephone complaint indicates it was received on February 18, 1981, more than 1 year before the attack, Mrs. Champagne's affidavit asserts that she made the call on February 18, 1982, the day before the attack. Her assertion is supported by the uncontested fact that Mr. Mason did not move into the neighborhood (with his pit bulls) until the fall of 1981. Moreover, the record reveals that another complaint made on February 18, 1982 bears the number 23720. Mrs. Champagne's complaint bears the number 23718. Further, Control Officer McCown's affidavit reflects she responded to a complaint about the pit bulls from Mrs. Peters on January 11, 1982 under number 22207 and on January 23, 1982 pursuant to complaint 22679 and again on January 25, 1982 pursuant to complaint 22697. The numerical sequence indicates Mrs. Champagne's complaint was received in 1982. Thus, it appears that Mrs. Champagne's complaint was, in fact, received the day before her son was attacked.

The Champagnes contend the trial court erred in dismissing their claim on the basis of the public duty doctrine. Although our Legislature has abolished sovereign immunity except with respect to discretionary acts, RCW 4.92.090 and 4.96.010, a plaintiff suing a governmental entity must still surmount the "public duty doctrine," *i.e.,* where a governmental entity breaches a duty owed to the public generally, rather than a particular individual, no liability may be imposed on that entity for any injury arising from breach of that duty. *J & B Dev. Co. v. King Cy.,* 100 Wn.2d 299, 303–04, 669 P.2d 468, 41 A.L.R.4th 86 (1983); *Taylor v. Stevens Cy.,* 47 Wn. App. 134, 136–37, 732 P.2d 517 (1987); *Honcoop v. State,* 43 Wn. App. 300, 308–09, 716 P.2d 963 (1986). Thus, "[t]he 'public duty' rule . . . provides that in order for an injured person to recover against a municipality he must show the breach of a duty owed to him as an individual and not merely the breach of an obligation owed to the general public." (Footnote omitted.) 18 E. McQuillin, *Municipal Corporations* § 53.04(b), at 165 (3d ed. 1984). The trial court concluded the Society owed a duty to enforce the animal ordinances to the general public and thus was not liable to the Champagnes as a matter of law.

The Champagnes assert the Society is a private corporation, rather than a public or governmental entity. Thus, the doctrine does not apply. We disagree. Although the Society is incorporated as a private, nonprofit corporation, the City of Spokane has contractually delegated to the Society the authority to enforce the animal regulations of its ordinance. *See* RCW 16.52.020; *Storey v. Seattle,* 124 Wash. 598, 602–04, 215 P. 514 (1923). Likewise, the obligations contractually undertaken by the Society are no different than those otherwise owed by Spokane to the general public. Thus, in assuming those animal control duties contractually, the Society is essentially acting as a public entity. *See State ex rel. State Humane Soc'y v. Hovey,* 159 Wash. 584, 587, 294 P. 258 (1930) (Humane Society "is not organized for the personal benefit of an individual or the personal benefit of any set of individuals, but is organized

for the public good, and is in its substance and effect a public corporation."); *Storey,* at 602 (Humane Society is "a public corporation, created by state law, to enforce its penal laws relating to the regulation of cats and dogs.").

In *Spiegler v. School Dist.,* 39 Misc. 2d 720, 241 N.Y.S.2d 967 (1962), *aff'd,* 19 A.D.2d 751, 243 N.Y.S.2d 74 (1963), *appeal denied,* 13 N.Y.2d 600, 196 N.E.2d 891, 247 N.Y.S. 2d 1026 (1964) on similar facts, a minor plaintiff was attacked by dogs. The plaintiff sued the New Rochelle Humane Society, Inc., which had contractually undertaken the enforcement of the New Rochelle animal regulation ordinance, for failure to properly enforce that ordinance's provisions. There, the court stated:

> The court finds no great difficulty in holding that [animal control] is governmental in nature. No one except the municipality, or an organization acting under authority given by the municipality, would possess the power or the facilities to perform such a service effectively. No one else would even have a duty to perform the service in the case of animals not privately owned. The protection of the public against marauding animals, whether wild or domestic, is similar in nature to the protection furnished by a police department against the lawless and depraved elements among men. The purpose in either case is the promotion of public safety, which is one of the first functions of government.

*Spiegler,* at 721.

We agree with *Spiegler*'s reasoning and likewise hold the Society had undertaken to carry out the governmental function of animal control. Accordingly, there is no principled reason for holding the Society liable when an otherwise public entity could not be held liable. The rationales for applying the public duty doctrine to municipal corporations do not disappear simply because the Society is ostensibly a private corporation.

One rationale for invoking the public duty doctrine as a bar to liability is that our courts are concerned that duties owed to the public as a whole should not give rise to overwhelming or excessive liability. *See Chambers–Castanes v.*

*King Cy.,* 100 Wn.2d 275, 291, 669 P.2d 451, 39 A.L.R.4th 671 (1983) (Utter, J., concurring). If the public duty doctrine is not applied to private corporations undertaking such public duties, the risk of excessive liability becomes an economic disincentive for such corporations to undertake public functions. The discouragement of efficient, private corporations would in turn, lead eventually to higher economic cost to society as a whole. Therefore, we hold the public duty doctrine should be applied to nongovernmental entities which have contractually assumed the duty to perform governmental functions where, as here, the duty is owed to the general public.

Notwithstanding, the Champagnes contend even if the doctrine applies, they fall within one or more exceptions to that rule. Washington has recognized at least three exceptions to the public duty doctrine: (1) the special relationship exception, *J & B Dev. Co.,* at 304; *Chambers–Castanes,* at 286; (2) the legislative intent exception, *Baerlein v. State,* 92 Wn.2d 229, 231–32, 595 P.2d 930 (1979); *Halvorson v. Dahl,* 89 Wn.2d 673, 676, 574 P.2d 1190 (1978); and (3) the third party relationship exception. *Honcoop,* at 313–15. *See Petersen v. State,* 100 Wn.2d 421, 428, 671 P.2d 230 (1983).[3] Under these exceptions, an entity performing governmental functions may be held liable where the plaintiff demonstrates that an otherwise general duty to the public has focused on the particular plaintiff and the entity breaches that duty. *See Hartley v. State,* 103 Wn.2d 768, 782–83, 698 P.2d 77 (1985). Because the facts support the application of only one of these exceptions, *i.e.,* the special relationship exception, we discuss that exception only.

The special relationship exception to the public duty doctrine arises where a relationship develops between an

---

[3]Our Supreme Court has also recognized an exception to the public duty doctrine where the governmental entity has gratuitously assumed a duty to aid or warn a person in danger. *Brown v. MacPherson's, Inc.,* 86 Wn.2d 293, 545 P.2d 13 (1975).

individual and agents of the entity performing a governmental function, such that a duty is created "to perform a mandated act for the benefit of particular persons or class of persons". (Footnote omitted.) *Chambers–Castanes,* at 285 (quoting *Campbell v. Bellevue,* 85 Wn.2d 1, 10, 530 P.2d 234 (1975)). Two elements must be met before an entity may be held liable under this exception: (1) some form of privity between the individual and the entity; and (2) reliance upon express or implied assurances of protection to the individual by the entity. *Chambers–Castanes,* at 286; *Taylor,* at 138–39; *Honcoop,* at 312. In *Chambers–Castanes,* at 286, the court held:

> The term privity is used in the broad sense of the word and refers to the relationship between the [entity] and any "reasonably foreseeable plaintiff". As to the second element, the assurances need not always be specifically averred, as some relationships carry the implicit character of assurance.

(Footnote and citations omitted.)

Here, the Society's records, as well as the affidavits, demonstrate that numerous calls were placed by the Champagnes and their neighbors over a 5–month period to the Society complaining about the pit bulls running loose and threatening the neighborhood. Thus, the record indicates sufficient facts exist to give rise to a material issue as to whether privity exists between the Champagnes and the Society. *See Chambers–Castanes,* at 287 (privity found where a crime victim and others placed several calls of help to police dispatchers). Additionally, the assurance element is met for purposes of summary judgment as Mrs. Champagne's affidavit specifically avers: "I was assured that the Humane Society would patrol the area and apprehend any stray dogs." *See Chambers–Castanes,* at 287 (assurance element met where dispatchers informed the victim that help was on the way); *J & B Dev. Co.,* at 306–07 (element met where developer relied on assurance of building department agent); *Rogers v. Toppenish,* 23 Wn. App. 554, 560–61, 596 P.2d 1096 (element met where buyer relied on

assurances with respect to zoning), *review denied*, 92 Wn.2d 1030 (1979). Thus, a genuine issue of material fact exists as to each element of this exception; the trial court erroneously granted summary judgment.

Finally, the Society contends that even if a duty is established under one or more of the above exceptions, the Champagnes have failed to establish breach or causation. With respect to breach, the Society maintains it could not have apprehended or impounded these dogs as Society officers are not allowed to carry out those acts where an officer does not personally see the dog or dogs running at large. Because the Society's records reveal the officers never saw the pit bulls at large, there is no evidence their conduct fell below the statutory standard of care.

However, our reading of the Society's contract and the Spokane city ordinance indicates those documents are ambiguous at best as to whether animal control officers must actually *see* animals running loose before impoundment. This ambiguity is further compounded by the fact that the Society had received several complaints about the dogs' demonstrated viciousness; whether this information imposed on the Society a higher standard of care than ordinary is an open question.[4] In any event, given the ambiguity of the ordinance's language, the Society's "rule" of not apprehending unleashed animals (especially where allegedly vicious) unless observed appears to constitute the Society's own internal "policy." Such a policy is not conclusive as to the standard of care owed by the Society where it knows or has a basis of knowledge that the animal is

---

[4]Spokane city ordinance, sections 10.24.010–.030, relating to "vicious" animals, arguably provides a basis for requiring the Society to treat suspected or alleged "vicious" dogs differently from dogs which simply run loose. Although not cited by either side, these provisions provide requirements for determining whether a particular animal may be deemed vicious. They further mandate that such animals be separately licensed. Although these provisions deal with licensing and therefore are not directly applicable as to whether impoundment procedures are different for allegedly vicious animals, the provisions' very existence is tacit acknowledgment that vicious, or as here allegedly vicious, animals should be treated differently.

"vicious" and is at best mere evidence of such a standard.

Moreover, assuming the Society is correct as to the extent of its duty of due care, there is no evidence that it thoroughly investigated the neighbor's complaints about the dogs. Although the Society's records reveal it went to Mr. Mason's house on several occasions after receiving complaints,[5] there is no indication the Society's officers: (1) conducted follow–up interviews with the known complainants; (2) advised complainants they could file affidavits about the dogs running loose in violation of section 1 of ordinance C13835; or (3) advised that the complainant could file an affidavit pursuant to chapter 10.24 of the city ordinances, in support of having the animals declared "vicious." *See* Spokane city ordinance, sections 10.24.020-(A)(2) and .030(B). Rather, it appears the control officers merely drove through the neighborhood after receiving a complaint without contacting the complainant even though his or her name and address were known. Thus, we decline to hold, as a matter of law, that the Society met its duty of care.

With respect to proximate cause, the negligence of two or more persons may combine to cause an injury. *Mason v. Bitton,* 85 Wn.2d 321, 326, 534 P.2d 1360 (1975). Although Mr. Mason was negligent in allowing the pit bulls to run loose, it does not follow that the Society may not be liable for its later negligence, if any, in failing to apprehend the pit bulls.

We reverse and remand.

SWANSON and GREEN, JJ., concur.

Review denied by Supreme Court September 1, 1987.

---

[5]A Society officer apparently interviewed a person at the residence on one occasion; that person alleged he was not Mr. Mason.