[No. 52997–3.   En Banc.   July 15, 1988.]

WILLIAM J. HONCOOP, ET AL, *Petitioners,* v. THE STATE
OF WASHINGTON, ET AL, *Respondents.*

TONY VELTHUIZEN, ET AL, *Petitioners,* v. THE STATE
OF WASHINGTON, *Respondent.*

TONY VELTHUIZEN, ET AL, *Petitioners,* v. HAROLD
HOLLOWAY, ET AL, *Defendants,* THE STATE
OF WASHINGTON, *Respondent.*

*Hal Thurston* (of *Simonarson, Visser, Zender, Brandt & Thurston*), for petitioners Honcoop, et al.

*Jerry Schumm* and *Buckland & Schumm,* for petitioners Zylstra, et al.

*Bricklin & Gendler,* by *David A. Bricklin,* for petitioners Heida, et al.

*Kenneth O. Eikenberry, Attorney General,* and *Narda Pierce, Assistant,* for respondent.

DORE, J.—Dairy operators may not maintain a negligence action against the State of Washington and the State Department of Agriculture for losses suffered when their dairy herds became infected with brucellosis. We hold that the petitioners' claims are barred and render judgment for the State.

FACTS

Brucellosis is a highly contagious bacteriological disease that infects cattle and humans. In cattle, the disease causes abortions in pregnant cows and lowered milk production. Cattle become infected with brucellosis by ingesting contaminated aborted matter, feed or water. The disease is often spread from infected herds to neighboring healthy herds.

In humans, brucellosis is a systemic disease characterized by fever, headaches, weakness and generalized aching that may last for several days, months or occasionally years. Meningitis and pneumonia may also occur. Transmission of the disease to humans occurs by contact with infected cattle or by the consumption of unpasteurized milk or cheese from infected cows. Ultimate control of brucellosis in humans rests in elimination of the disease in cattle.

Washington entered into a cooperative brucellosis control and eradication program with the United States Department of Agriculture. *See* RCW 16.36.100. The program virtually eliminated brucellosis in Washington and the state was certified brucellosis free in 1966. By 1974 Washington's neighboring states, particularly Idaho, experienced a significant increase in brucellosis. In 1976 the disease was reintroduced into Washington.

The dairy operators contend that their herds became infected with brucellosis in 1977 and 1978. They traced the infection in their herds to Harold Holloway, a Washington cattle dealer who imported dairy cows from Idaho. Tony Velthuizen, Alvin Heutink, Gene Megard, Pete Speelman, Kenneth G. Rupke, and Bonne Hilverda purchased infected cows from Holloway at auctions in Washington in 1977 and 1978. Frank Ruzicka and Karl Heida contend that their herds were infected through contact with neighboring herds that had been infected by cows purchased from Holloway. William J. Honcoop and Bobbie Zylstra argue that their herds became infected when a cattle hauler transported their healthy cattle with infected Holloway cattle.

The dairy operators, except Zylstra and Speelman, were unable to control the spread of brucellosis and their herds were slaughtered. As the dairy operators learned that their herds were infected, they filed complaints against Holloway, the State of Washington, and, in the case of Honcoop and Zylstra, against the cattle hauler. The complaints were consolidated in Whatcom County Superior Court. The trial court applied the "public duty doctrine" and granted the State summary judgment dismissing all claims. The Court of Appeals reversed the order with respect to the claims of two dairy operators and affirmed the trial court's order as to the others. *Honcoop v. State,* 43 Wn. App. 300, 316–17, 716 P.2d 963 (1986).

## REGULATORY FRAMEWORK FOR BRUCELLOSIS ERADICATION

At this juncture, we must identify the duties owed by the State and the livestock industry under the state brucellosis control and eradication program. At the time this action arose, the Director of Washington's Department of Agriculture was granted general supervisory authority for

> the prevention of the spread and the suppression of infectious, contagious, communicable and dangerous diseases affecting the domestic animals within, in transit through, and, by means of the division of dairy and livestock, may establish and enforce quarantine of and against any and all domestic animals . . . for such length of time as he deems necessary to determine whether any such animal is infected with any such disease.

Laws of 1953, ch. 17, § 2, p. 18 (former RCW 16.36.020); *see* Laws of 1959, ch. 161, § 1, p. 759 (former RCW 16.40.010). The Director also has the power to promulgate and enforce reasonable rules, regulations and orders for the testing of all domestic animals imported into the state. Laws of 1947, ch. 172, § 3, p. 789 (former RCW 16.36.040).

Prior to 1977, cattle imported into the state were to be accompanied by a health certificate issued by the state of origin of the animal certifying that the animal is free from evidence of infectious and communicable diseases. Former

WAC 16–54–030 (1970). Cattle from a brucellosis–free herd, area or state accompanied by an official health certificate were exempt from any further brucellosis test requirements. Former WAC 16–54–080(2)(a) (1970). Animals imported from areas that were not certified brucellosis free were required to be tested for brucellosis prior to movement within the state. Former WAC 16–54–080(2)(b) and (c) (1970).

To carry out brucellosis testing, livestock markets employed veterinarians to draw blood samples from cattle to be sold. The samples are classified as either "negative", "suspect" or "a reactor" (tests positive for brucellosis). Reactor classification is based "on standards listed in 'U.S. Department of Agriculture Uniform Methods and Rules for Brucellosis Eradication.'" WAC 16–86–040(1).

If an animal is classified as a reactor, the owner must slaughter the animal and quarantine the herd from which the reactor originated. The quarantine will be released when the entire quarantined herd has passed two consecutive negative brucellosis tests. WAC 16–86–040; see RCW 15.36.150. The owner of a slaughtered animal is entitled to indemnity payments. See RCW 16.36.096; Laws of 1947, ch. 172, § 10, p. 795 (former RCW 16.40.060, repealed by Laws of 1985, ch. 415, § 13). Although the regulations require the quarantine of brucellosis suspects, no regulations have been promulgated for retesting or quarantine release of suspects.

In April 1977, after brucellosis had spread to Washington, the Director, by emergency order, amended the regulations governing the importation of cattle. The amended regulations provide that all imported cattle be moved on a permit issued by the State. The amended regulations further provide that all cattle be tested negative to an "official brucellosis test" within 45 days prior to importation, that they be quarantined on arrival and that they be retested not less than 30 days nor more than 60 days from the date of the first test. Former WAC 16–54–082(2) (1977). A brucellosis test is "official" if the blood sample is tested at the

state laboratory, or an independent test is confirmed by the state laboratory. *See* WAC 16–54–010.

The dairy operators argue that the State assumed the additional duty to "trace back" suspects or reactors to their herds of origin and to then warn all owners whose cattle may have been exposed to the suspect or reactor. The dairy operators base their argument, in part, on the USDA Uniform Rules requirement that an epidemiological investigation be carried out whenever a suspect or reactor is discovered. The trace back provisions of the Uniform Rules have not been adopted in Washington and therefore do not create a duty owed by the State.[1]

The dairy operators argue that the State assumed a duty to trace back in an "open letter" sent by the Department to the livestock industry. The letter, dated July 28, 1977, advised public livestock markets of their duty to keep accurate records of all buyers and sellers "so animals may be traced back if suspects or reactors are identified through the official brucellosis test performed in the Department of Agriculture state laboratory in Olympia." The letter further stated:

> The department shall also attempt to tighten down the control on movement of animals without proper evidence of health status and shall attempt to secure the assistance of Washington law enforcement agencies.

The letter creates no duty in the State but merely indicates that the State "will attempt" to trace back infected animals as the resources of the Department permit.

In sum, the State in 1977 assumed the duty to conduct the official brucellosis test by which an animal's official health status is determined. Once the animal's official

---

[1]By order of the trial court, the dairy operators submitted detailed statements of their negligence claims against the State. Many of the alleged acts of negligence concern the State's failure to adopt and comply with the procedures set forth in the USDA Uniform Rules and the State's alleged ineffective response to the outbreak of brucellosis in Washington. As these decisions involve high level discretionary acts exercised at the executive level, the State is entitled to governmental immunity. *See Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 255, 407 P.2d 440 (1965).

health status is determined and the owner notified, the owner has the duty to quarantine and slaughter or retest. An owner who fails to comply may be subject to civil or criminal sanctions. *See* RCW 16.36.110.

## PUBLIC DUTY DOCTRINE

■ It is axiomatic that to maintain a negligence action a duty of care running from the defendant to the plaintiff must be shown. Where the liability of a governmental entity is at issue, we have employed the "public duty doctrine" to determine whether the duty is one owed to a nebulous public or whether that duty is owed to a particular individual. The public duty doctrine provides that regulatory statutes impose a duty on public officials which is owed to the public as a whole, and that such a statute does not impose any actionable duty that is owed to a particular individual. *Bailey v. Forks,* 108 Wn.2d 262, 265–66, 737 P.2d 1257 (1987); *Chambers–Castanes v. King Cy.,* 100 Wn.2d 275, 284, 669 P.2d 451, 39 A.L.R.4th 671 (1983).

## LEGISLATIVE INTENT

■ The traditional public duty rule of nonliability does not apply where a regulatory statute by its terms evidences a clear legislative intent to identify and protect a particular and circumscribed class of persons. If a statute evidences an intent to protect a particular class of individuals, a member of that class may bring a tort action against a governmental entity for its violation of the statute. *Baerlein v. State,* 92 Wn.2d 229, 231–32, 595 P.2d 930 (1979); *Halvorson v. Dahl,* 89 Wn.2d 673, 676, 574 P.2d 1190 (1978). The dairy operators argue that the brucellosis statutes and regulations evince a clear legislative intent to protect individual dairy operators.

Former RCW 16.36.090, provided in part:

Whenever in the opinion of the Director of Agriculture, upon the report of the Supervisor or a duly appointed and qualified veterinarian of the Division of Dairy and Livestock, *the public welfare demands the destruction of any animal found to be affected with any infectious,*

*contagious, communicable or dangerous disease,* he shall be authorized to by written order direct such animal to be destroyed . . .

(Italics ours.) Laws of 1947, ch. 172, § 9, p. 792; *see* RCW 16.38.010. Similarly, the emergency order amending import regulations was issued "for the immediate protection of the *public health* and the general health of the cattle population of the State." (Italics ours.) Washington Department of Agriculture Emergency Order 1525, dated April 22, 1977.

The brucellosis statutes and regulations were enacted pursuant to the police power for the "public welfare" and the "public health" of the people of Washington. *See* 4 Am. Jur. 2d *Animals* §§ 32–34 (1962); 3A C.J.S. *Animals* §§ 67 and 73 (1973). Brucellosis is an occupational disease commonly contracted by slaughterhouse workers and can be spread to the general public. The Legislature recognized that the protection of the public health necessarily depends on control and eradication of the disease in animals. The Legislature also provided that the Director pay an *indemnity for slaughtered cattle.* This is further evidence that the Legislature did not intend dairy operators to sue the State for damages arising out of the brucellosis program.

Indemnity for slaughtered cattle is strong evidence of a legislative intent not to protect the individual class of dairy operators. The State cannot be held liable for damages unless the dairy operators fall within one of the recognized exceptions to the public duty rule.

### Failure To Enforce Exception

The gravamen of the dairy operators' claim against the State is that the State negligently failed to enforce the brucellosis statutes and regulations. The dairy operators allege, and the record indicates, that Holloway failed to comply with animal importation, quarantine, release from quarantine, testing and retesting requirements.

In *Bailey v. Forks,* 108 Wn.2d 262, 737 P.2d 1257 (1987) we recognized the "failure to enforce" exception to

the public duty doctrine. We held that a general duty of care owed to the public can be owed to an individual

> where [1] governmental agents responsible for enforcing statutory requirements [2] possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and [3] the plaintiff is within the class the statute intended to protect . . .

*Bailey,* at 268; *see Campbell v. Bellevue,* 85 Wn.2d 1, 12–13, 530 P.2d 234 (1975).

The first and third elements are clearly satisfied. The Director is responsible for the enforcement of the brucellosis control program. RCW 16.36.020 and .040. The dairy operators are also within the class of individuals the brucellosis control program is intended to protect. The question presented is whether a public official possessed actual knowledge of a violation of a statutory duty and failed to take corrective action despite a duty to do so.

Although the State discovered brucellosis suspects in cattle sold by Holloway as early as April 1977, our review of the record reveals that the State did not have *actual* knowledge of a statutory violation until June or July 1978.

In March 1978, a USDA official met with Holloway and prepared an investigative report of his overall cattle operation. In June 1978, the USDA regional epidemiologist sent a memorandum to the state veterinarian which concluded that the increase in infection in Whatcom County was associated with cattle sold by Holloway. Finally, in July 1978, the USDA sent a letter to the state veterinarian advising that

> Mr. Holloway has very little regard for the State regulations that pertain to the movement of cattle restricted by State quarantine.

Clerk's Papers, at 166. Upon learning of these violations, the Director was under a duty to enjoin Holloway from continuing such violations and/or bring a criminal action. RCW 16.36.110; WAC 16–54–150, 16–86–100.

None of the dairy operators allege that their herds became infected after June or July 1978 when the State

first had knowledge of Holloway's statutory violations. Thus, none of the operators fall within the failure to enforce exception to the public duty doctrine. As the State had no actual knowledge of a statutory violation at the time the dairy operators suffered their damages, there is no duty that the State owes the operators, and consequently no breach of duty to trigger the proximate cause of the operators' damages.

## SPECIAL RELATIONSHIP EXCEPTION

We have already indicated that the limited duties assumed by the State under the brucellosis control statutes and regulations are duties owed to the public at large and that the breach of such duties will not support a cause of action by an individual. One exception to the public duty rule is where a "special relationship" exists between a public official and the individual. Under this exception, the interactions of the plaintiff and a public official create a special relationship between them, such that the official assumes a duty to use due care for the benefit of the plaintiff. *Campbell v. Bellevue,* 85 Wn.2d 1, 10, 530 P.2d 234 (1975).

The dairy operators, relying on *J & B Dev. Co. v. King Cy.,* 100 Wn.2d 299, 669 P.2d 468, 41 A.L.R.4th 86 (1983), allege a special relationship between themselves and the State. In *J & B Dev. Co.,* King County issued a building permit to a developer. The approving official and a later inspection failed to detect that the building plans did not comply with county setback requirements. Although the County did not give express assurances that the building complied with the setback requirements, this court found that the issuance of the permit inherently implied that the plans were in compliance. This court held that inherent assurances in a duty vested in a public official were sufficient to create a special relationship which in turn gave rise to a duty of care on the part of the County. *J & B Dev. Co.,* at 306–07.

■ We overruled *J & B Dev. Co.* in *Taylor v. Stevens Cy.,* 111 Wn.2d 159, 168, 759 P.2d 447 (1988) and *Meaney v. Dodd,* 111 Wn.2d 174, 180, 759 P.2d 455 (1988). There, we held that a governmental duty cannot arise from implied assurances. A special relationship triggers an actionable duty where: (1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) give rise to justifiable reliance on the part of the plaintiff. *Taylor,* at 166; *Meaney,* at 178–79.

By affidavit, Hilverda, Speelman, Rupke, Honcoop, Zylstra, Ruzicka and Heida state:

> We were not adequately informed about the outbreak of brucellosis in Whatcom County by the state Department of Agriculture. We were not told which herds were infected, nor what risks we faced, nor how to protect ourselves and our herds against infection. Even when state or federal officials visited our farm[s], they did not give us complete or adequate information. If we had been given this information, there is a reasonable possibility that we could have avoided the infection.

*See, e.g.,* Clerk's Papers, at 484. Velthuizen's affidavit states:

> After brucellosis broke out in Whatcom County in 1976, and before my quarantine in June 1978, it appeared to me that the State Department of Agriculture was very involved in the brucellosis problem. I was aware that the State was establishing stricter requirements for importing and selling dairy cattle. I was also aware that the State licensed and supervised cattle dealers. I assumed that the State was doing a good job enforcing these requirements and relied upon that when I chose to purchase animals at a public auction.

Clerk's Papers, at 511.

Applying the special relationship test, we conclude that these dairy operators have failed to allege a special relationship between themselves and the State. Although seven of the eight dairy operators allege direct contact with the State, none alleges that the State made express assurances

that could give rise to justifiable reliance. Mere allegations that the State failed to provide adequate information or that the State failed to explore every possible risk or contingency is not sufficient to satisfy the assurance prong of the special relationship test. Further, there is no evidence in the record that the State made any representations that could have induced the operators into believing that they need not take any measures to protect their herds from the spread of the disease.

The Court of Appeals held that Heutink and Megard fell within the special relationship exception. *Honcoop,* 43 Wn. App. at 313. The State did not assign error to this aspect of the court's opinion, therefore, the propriety of the court's holding as to these petitioners is not before us. RAP 13.7(b); *see Garth Parberry Equip. Repairs, Inc. v. James,* 101 Wn.2d 220, 225 n.5, 676 P.2d 470 (1984).

THIRD PARTY RELATION/STATUTE OF LIMITATIONS

The dairy operators argue that the rationale of *Petersen v. State,* 100 Wn.2d 421, 671 P.2d 230 (1983) applies in this case. In *Petersen* the court relied on Restatement (Second) of Torts § 315 (1965) and held that a "special relation" existed between a psychiatrist and a known–to–be–dangerous patient which gave rise to an actionable duty to take reasonable precautions to protect anyone who might foreseeably be endangered by the patient. *Petersen,* at 426–28.

A review of the cases applying section 315 discloses that a duty to a particular individual will be imposed only upon a showing of a definite, established and continuing relationship between the defendant and the third party. *E.g., Petersen v. State, supra; Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14, 83 A.L.R.3d 1166 (1976). The relationship between the State and Holloway is too tenuous and unsubstantial to warrant application of Restatement section 315. Here, the Director had regulatory authority over Holloway. Regulatory control over a third party is not sufficient to establish the necessary control which can give rise to an actionable duty. *See*

*Hartley v. State,* 103 Wn.2d 768, 783–84, 698 P.2d 77 (1985).

Finally, the State contends that Megard's claim, which the Court of Appeals concluded could be maintained under the special relationship exception to the public duty doctrine, is barred by the 3–year statute of limitations. RCW 4.16.080(2). Megard contends that his claim is not time barred because he filed his complaint within 3 years of "discovering" all facts which gave rise to his cause of action. *See U.S. Oil & Ref. Co. v. Department of Ecology,* 96 Wn.2d 85, 91, 633 P.2d 1329 (1981). We concur with the Court of Appeals holding that whether Megard's action is time barred is a question of fact that must be determined on remand. *Honcoop,* at 307–08; *see Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 510, 598 P.2d 1358 (1979); *Vigil v. Spokane Cy.,* 42 Wn. App. 796, 800, 714 P.2d 692 (1986).

## Conclusion

We find that the legislative intent rule and the failure to enforce and the special relationship exceptions to the public duty doctrine do not apply in this case. We conclude that the State owed no actionable duty to the dairy operators arising out of the brucellosis program at the time the dairy operators suffered their damages and that there is no proximate cause for such damages.

Applying the public duty doctrine, we hold, as a matter of law, that the State is entitled to summary judgment dismissing the dairy operators' claims. As to the negligence claims of Heutink and Megard, the judgment of the Court of Appeals is affirmed.

PEARSON, C.J., and UTTER, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

BRACHTENBACH, J., concurs in the result.

Reconsideration denied January 13, 1989.