Alfredo **MARIN**, as Personal Representative of the Estate of Maria Marin–Bobadilla, and Alfredo Marin, as Guardian of Robert Vargas Marin, Victor Vargas Marin and Jose Vargas Marin, minors, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

**No. CR–91–135–JLQ.**

United States District Court,
E.D. Washington.

Sept. 3, 1992.

Lou Delorie, Wiley Hurst & Associates, Yakima, WA, for plaintiffs.

Carroll Gray, Asst. U.S. Atty., Spokane, WA, Nancy E. Friedman, Stephen E. Handler, Trial Atty., U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

QUACKENBUSH, Chief Judge.

This matter came regularly on for trial by the court on the 17th day of June 1992. The Plaintiffs appeared personally and with their attorneys, Lou DeLorie and Patrick J. Morrissey. The Government was represented by Steven Handler, Trial Attorney of the Civil Division of the United States Department of Justice.

Evidence was introduced and the court heard the argument of counsel. The court rendered an oral opinion. Supplemental briefs were thereafter submitted by the parties. This Opinion is intended to be the final decision of the court and shall replace any portion of the court's oral opinion that is inconsistent herewith. Being fully advised in the premises, the court makes the following:

## FINDINGS OF FACT

This case arises from the tragic murder of Maria Marin–Bobadilla (Ms. Marin), the mother of three young sons, by an indicted federal felon, who was released from custody at the instance of an Immigration and Natu-

ralization Service (INS) agent in order that the felon could work "undercover" for the INS. As will be more fully set forth, infra, the felon immediately absconded from the conditions of his release. Despite the fact that the INS was fully informed as to his prior assaults on the victim, his illegal possession of firearms, and his prior threats to kill the victim, the INS took no action to warn the victim or the authorities, or to apprehend the felon.

At the time of the murder of their mother, Ms. Marin, the minor Plaintiff Robert Vargas was 14 years of age. Victor Vargas was 11 years of age, and Luis Vargas was 9 years of age. Their mother was a single parent, the father of the children having previously abandoned his wife and children. Ms. Marin was a loving, attentive parent who participated fully in all school and church activities with her children. She was a legal resident of the United States, and at the time of her death, had lived and worked in the Brewster, Washington area for many years. Ms. Marin was born on April 1, 1955. At the time she was shot and killed by Quintil Lopez–Fuentes (Lopez) Ms. Marin was 33 years old. Her life expectancy was 47.3 years.

Lopez is a citizen of Mexico, who had been illegally residing in the United States in the Brewster, Washington area when not in jail on various charges, or when not briefly in Mexico after having been deported from this country. Lopez had been deported from this country on five or six separate occasions. Each time, he promptly returned illegally to this country. Despite these occurrences, until the events recited herein, the INS never attempted to indict Lopez for these felonious activities.

Lopez had a history of harassing and assaulting Ms. Marin, with whom he was casually acquainted. Lopez apparently was infatuated with Ms. Marin. The records of the Brewster Police Department indicate that three formal investigations had been conducted into Lopez's assaults and other misconduct toward Ms. Marin, including threats to kill Ms. Marin, and possession of firearms during the assaults on her. The Brewster Police Department case reports are as follows:

1. January 3, 1987—Assault on Maria Marin;

2. July 31, 1987—Possession of stolen property and second degree rape;

3. August 14, 1987—Intimidating a witness and possession of stolen property—This incident and its report included a threat by Lopez to kill Ms. Marin.

At all times relevant to this case, the employees and agents of the United States who dealt with Lopez were aware of the contents of the Brewster Police Department files on Lopez, including his prior assaults on Ms. Marin, and were aware that he had possessed firearms. The federal officials were likewise aware of the fact that Lopez had threatened to kill Ms. Marin.

Lopez was again deported from the United States on October 8, 1987, after the completion of his state sentence for the August 14, 1987 assault on Ms. Marin. Shortly thereafter, on or about November 6, 1987, Lopez was seen by the Brewster police back in that town. The Brewster police deemed Lopez to be a threat to the security of the town and also toward Ms. Marin. They therefore contacted INS officials and informed them that Lopez was such a threat, and that he should be criminally charged with his blatant violations of the laws of the United States by his returning each time he was deported from this country.

On November 17, 1987, the Grand Jury of the United States District Court for the Eastern District of Washington indicted Lopez for violation of 8 U.S.C. § 1326, a felony, for being an alien found in the United States without permission after having being previously deported. A warrant was issued for Lopez and he was arrested by the Brewster Police on that warrant on December 6, 1987.

Lopez was thereafter arraigned before Magistrate Judge Hovis in Spokane, Washington, and based upon his violent criminal history and the risk of flight, he was ordered detained pending trial. Attorney Hugh Kelly, a member of the CJA panel for this district, was appointed to represent Lopez. William Beatty, an Assistant United States Attorney, represented the Government in that prosecution.

Attorney Kelly informed Mr. Beatty that Lopez desired to obtain permanent residency in the United States in exchange for information concerning alleged drug dealing in the Okanogan Valley, located in the northern part of this district adjacent to the Canadian border. Brewster, Washington is located in the Okanogan Valley. Kelly at first told Beatty that Lopez had information concerning alleged drug dealing by a member of the Washington State Patrol, but thereafter this was changed to report that Lopez had "information about a dirty policeman in Brewster." No specific or reliable factual basis for this claimed knowledge by Lopez was given to Mr. Beatty or any other Government representative.

Mr. Beatty was and is an experienced and competent Assistant United States Attorney. At all times that Mr. Beatty dealt with this case, he was aware of Lopez's assaultive nature, his danger to Ms. Marin, and his propensity to illegally possess firearms. He was aware of Lopez's prior threats to kill Ms. Marin. Mr. Beatty stated that he "saw a potential for danger," if Lopez was released.

Mr. Beatty conveyed to the federal Drug Enforcement Administration (DEA) officers the offer made by Lopez, through attorney Kelly, to work in some undercover capacity for a federal agency. A meeting concerning this matter was held with Lopez's attorney, Mr. Kelly, by agents of the DEA and the INS, including Russell Manchester, the officer in charge of the Spokane office of the INS. Thereafter, in view of Lopez's criminal history, assaultive nature, and lack of reliability, the DEA informed Mr. Beatty and Mr. Kelly that they were not interested in Lopez's offer of using him as an informant.

Mr. Beatty then discussed attorney Kelly's offer with Mr. Manchester. Mr. Manchester discussed the matter further with Mr. Kelly. Exhibit 214ZZ indicates that Mr. Manchester made an unbenevolent remark about the DEA to Mr. Kelly, and then informed Mr. Kelly that the INS could now work drug investigations, and that "we'll handle the case." There was no evidence that Mr. Manchester had received any training in matters such as these, it appearing to the court that

Mr. Manchester and the INS were new to "the war on drugs".

Mr. Manchester was toward the end of a distinguished career with the INS, but had not previously been involved with the use of an alien on Pretrial Diversion status for undercover narcotics work, or the utilization of an indicted felon for such a purpose. Mr. Manchester is now retired after 33 years of service. The Spokane office of the INS had only recently become a member of a Drug Task Force in the Yakima, Washington area, along with officers from other federal and state agencies. Such membership placed the INS agents in law enforcement roles in which they had not traditionally been involved. There was no evidence that these agents had received training in the supervision of indicted felons whose release they had obtained for informant work. There was no evidence that Mr. Manchester had any prior experience with a Drug Task Force or drug investigations. His lengthy prior experience was devoted to immigration matters.

After the proposal from attorney Kelly to Mr. Manchester, Mr. Manchester familiarized himself with Lopez's alien and criminal files, and was made aware of Lopez's assaultive nature, his threats of death toward Ms. Marin, and Lopez's prior illegal possession of firearms. Despite this, Mr. Manchester made the decision to seek the release of Lopez from custody, and to send him to Yakima, Washington to work as an informant with the Drug Task Force. Mr. Manchester knew that Lopez had never before worked in such a capacity. Nothing in Lopez's files indicated that he had been a reliable person, that he would be a reliable informant, or that he would abide by the terms of a Pretrial Diversion Agreement. Mr. Manchester knew of Lopez's unreliability as to compliance with the law.

Mr. Beatty then prepared a Pretrial Diversion Agreement (Ex. 6) which provided that Lopez was to be released from custody, and that he could remain in this country for a period of 1 year, even though he was an alien illegally in this country and had previously been deported a number of times. This Agreement provided in part that Lopez was to assist and cooperate with the INS and/or

DEA "as directed by your program supervisor."

One officer from the INS, agent John Bower, had been assigned to this Task Force. He had only been assigned to this unit in the month of December 1987, the same month Lopez was arrested. Mr. Manchester designated agent Bower as Lopez's "program supervisor". Agent Bower was not consulted concerning his being designated as "program supervisor" prior to the execution of the Pretrial Diversion Agreement by Mr. Manchester and, in fact, did not meet Lopez until after Lopez had been released from custody pursuant to the Pretrial Agreement. Likewise, Bower was not advised of Lopez's criminal history, or of his prior assaults on and threats to kill Ms. Marin. Bower was not advised of Lopez's prior illegal possession of firearms. Mr. Manchester signed the Pretrial Diversion Agreement as Program Supervisor "for John Bower."

Mr. Beatty, concerned about the assaultive nature of Lopez and his prior assaults on Ms. Marin in Brewster, Washington, inserted the following language in the Pretrial Diversion Agreement with the knowledge of Mr. Manchester:

> You shall not visit the Brewster area during the period of this agreement unless given permission in writing from your program supervisor.

In his many years with the INS, Mr. Manchester had never before been a party to such a Pretrial Diversion Agreement, and there is no evidence that anyone in the Spokane office had previously dealt with, or been trained for supervision of a person with Lopez's criminal history.

Upon execution of the Pretrial Agreement by Lopez, his attorney, and Mr. Manchester, Mr. Beatty obtained an Order from the court releasing Lopez pursuant to the terms of the Agreement. Mr. Bower, the designated supervising agent, had still not been introduced to Lopez, although he had met with Lopez's attorney when Mr. Kelly first proposed the use of Lopez as an undercover agent. At this first meeting, Mr. Kelly had informed Agent Bower that Lopez claimed to have information about a Washington State Trooper selling cocaine. At the time of the execution of the Pre-trial Diversion Agreement, Bower was completely unaware of the further negotiations, the proposed use of Lopez as an informant, Lopez's background, or his criminal record. Mr. Manchester did not inform Agent Bower of these facts.

Neither Mr. Beatty nor Mr. Manchester, nor any other federal agent notified the Brewster Police or Ms. Marin of the release of Lopez, or the terms and conditions of the Release Agreement which, *inter alia,* prohibited Lopez from returning to the Brewster, Washington area. The innuendo from the testimony of some of the witnesses for the Government was that the reason for this omission was that Lopez allegedly had information concerning drug activity by a Brewster policeman. This suggestion lacked credibility with the court. Neither Mr. Beatty nor Mr. Manchester felt that such allegations by Lopez were credible. Lopez was not released from custody to pursue such allegations. He was released from custody for the purported purpose of becoming an informant in the Yakima, Washington area, some 200 miles from Brewster, Washington. In fact, he was prohibited from returning to Brewster.

The Government also suggested that Lopez was not a danger to the community or to Ms. Marin in that he had not committed other crimes between September 1987 and his murder of Ms. Marin on April 9, 1988. This claim is frivolous and without any basis in fact. Lopez was continuously in jail on the state charges arising out of his latest assault of Ms. Marin on or about August 14, 1987, and thereafter was in custody on the federal Alien After Deportation charge until released pursuant to his "deal" with the Government on or about March 18, 1988. The fact that he was in jail during the entire period was the reason he did not commit further crimes.

Upon the release of Lopez from custody on the pending federal felony charge pursuant to the terms of the Pretrial Diversion Agreement, he was taken to Mr. Manchester's INS office. Mr. Beatty was not thereafter involved with this matter. Agent Bower was returning to Spokane from an outside assignment and was told through his radio that he

was to report to Mr. Manchester's office as soon as possible. Upon his arrival at the Spokane INS office, Agent Bower was informed by Mr. Manchester that an agreement had been reached with Lopez for Lopez to work as an informant in the Yakima area, and that he had obtained Lopez's release from custody. Mr. Bower reviewed the Pretrial Diversion Agreement, but still was not informed of Mr. Lopez's prior criminal history or his threats to kill Ms. Marin.

Acting at the direction of Mr. Manchester, Agent Bower instructed Lopez that he was to move to Yakima, Washington, and to report by telephone to Mr. Bower or Mr. Manchester's assistant, Mr. Burcham, each Friday commencing March 25, 1988. Agent Bower, who speaks Spanish, reviewed the terms of the Pretrial Diversion Agreement with Lopez, including the fact that Lopez was not to return to Brewster, Washington. Lopez was then released.

Thereafter, there was a complete breakdown in communications between Agent Bower and Mr. Manchester as to Lopez's supervision. Throughout his testimony, Agent Bower denied that Mr. Manchester had informed him of Lopez's violent criminal history and threats, or that Manchester had advised him that Manchester had been informed that Lopez was back in the Brewster area. Manchester stated that he had informed agent Bower of these facts.

Despite the contradictions in the testimony of these two Government agents, what is clear is that the agents in the office which had undertaken the supervision of Lopez were fully aware of his violent criminal history, his illegal possession of firearms, and his threats of death directed toward Ms. Marin. The breakdown or lack of communication was the proximate cause of absolutely no supervision of Lopez after his release, no advice to Mr. Beatty or any other officer of the court of Lopez's absconding, or of his return to Brewster, and no appropriate action of any kind to take Lopez back into custody when it was clear he had violated all conditions of his release.

While Agent Bower was designated as the "program supervisor" in the Pretrial Diversion Agreement, in fact, Mr. Manchester ne-

gotiated the terms of the Agreement, was fully aware of the risk of Lopez's release, was fully informed of Lopez's criminal history, but apparently failed to inform Agent Bower of these facts. Mr. Manchester had equal responsibility to oversee and participate in the supervision of Lopez after his release, and to take appropriate actions to return Lopez to custody after it was crystal clear that Lopez had absconded and returned to Brewster.

At the time Lopez was released from custody, the INS had in place an INS Investigator's Handbook (Exhibit 219). Chapter 2–3 refers to the use and control of informants. Page 2–3.11 provides in part as follows under the section denominated INFORMANT CONTROL AND REPORTING SYSTEM:

> The success of the investigator's network of informants will be based on a current, accurate, and well-maintained reporting system. A strictly controlled system will protect the investigator and the Service from allegations of wrongful conduct and embarrassment. A uniform system will allow the investigator to be able to immediately evaluate the productivity and reliability of an informant and therefore insure that the informant's identity will remain confidential. . . .

> It is imperative for the investigator to understand that the informant control and reporting system is a Service-wide system which must be adhered to by all investigators. To insure uniformity, there should be no deviation from the use of this system by the investigator.

At page 2–3.6 of the Handbook, it is stated that

> the investigator must always remain in direct control of the informant. *It is paramount that the investigator be in absolute control of the informant's activities at all times since the informant can neither be held responsible or accountable for the consequences of his or her actions while working for the Service. Without strict control by the investigator, even the most reliable informant can compromise a case*

*as well as cause embarrassment to the Service ...*

(Emphasis supplied.)

At page 2–3.5 of the Handbook under a section entitled INFORMANT RELIABILITY, the following is found:

It is the duty of every investigator to continually evaluate the informant in order to develop an estimate of the informants reliability ... The investigator should periodically evaluate the informant's performance to insure that the Service's enforcement operations will not be compromised ... *If the investigator finds that an informant is either no longer reliable or credible, the informant's use should be discontinued immediately.*

(Emphasis supplied).

Lopez did not move to Yakima, Washington and he did not report to the INS by telephone on Friday, March 25, 1988, or on any Friday thereafter. Instead, he returned to Brewster, Washington, the town in which Ms. Marin resided, and the very place he was specifically ordered not to be. When Lopez did not report to him on March 25, 1988, Agent Bower discussed the matter with Mr. Burcham, the Assistant Officer in Charge in the Spokane office, but no action was taken.

Manchester had still not informed Bower of Lopez's violent criminal history or his threats to kill Ms. Marin. This withholding of such vital information was not based upon any policy or law enforcement purpose. It was a failure to communicate. Rather than attempting to justify the withholding of this information, Mr. Manchester claimed he did, in fact, inform agent Bower of these matters. Agent Bower testified that, had he been aware of the violent and assaultive criminal history of Lopez, he would have recommended the immediate issuance of a warrant and the immediate arrest of Lopez when Lopez failed to report on March 25, 1988. Mr. Beatty was never informed of any of the events which took place after the release of Lopez on March 18, 1988. Likewise, neither the Brewster Police Department nor Ms. Marin were advised by any federal official that Lopez had absconded.

On or before April 1, 1988, Mr. Manchester was informed by a Border Patrol officer that Lopez was back in the Brewster area, and the Brewster Police Department was very upset by this fact. The testimony of Government witnesses Manchester and Bower as to what then took place is again conflicting. What *is* clear is that Mr. Manchester did not advise Mr. Beatty of Lopez's return to Brewster, or the fact that Lopez had not moved to Yakima and had completely failed to report as ordered. Mr. Beatty testified that he expected to be advised of such an occurrence, as he would have considered it a serious matter in view of Mr. Lopez's past violent history, and also a material breach of the Pretrial Diversion Agreement. The court finds that, had Mr. Beatty been advised of these events, he would had ordered that Lopez be forthwith apprehended, and he would have obtained from the court a warrant for Lopez's arrest.

As indicated, the testimony as to what took place between Mr. Manchester and Agent Bower on and after April 1, 1988, is in conflict. Mr. Manchester testified that on or about April 1, 1988, he told Agent Bower of the fact that he had been informed that Lopez was back in Brewster. At this time, Mr. Manchester also knew that Lopez had not reported to Yakima and had not made telephone contact with the INS office on March 25, 1988, or thereafter. Agent Bower denied that Mr. Manchester advised him on April 1, 1988 that Lopez was back in Brewster. Agent Bower testified that he was not advised until on or about April 4, 1988 that Lopez was back in Brewster, and that he learned of this from Mr. Burcham.

Bower testified that Burcham told him that he should contact Mr. Kelly, Mr. Lopez's attorney, and have Mr. Kelly turn Mr. Lopez back in. In view of Lopez's prior criminal history and his complete breach of the Pretrial Diversion Agreement, such action amounted to no action at all. One could hardly expect Mr. Kelly, a court-appointed attorney in Spokane, to be able to contact Lopez and return him to federal custody, when in fact, Lopez had absconded and was reported to be again in Brewster, some 150 miles from Spokane. Agent Bower called

attorney Kelly on or about April 4, 1988 as directed. Mr. Kelly was very upset by the news that Lopez was back in Brewster. No testimony was offered as to whether Mr. Kelly attempted to contact Lopez.

At the time of these latter events, even though Mr. Bower had been designated as Lopez's "program supervisor," he had not been briefed as to Lopez's criminal history, his violent nature, his threats to Ms. Marin, and his prior illegal possession of stolen firearms, even though Mr. Manchester knew that Lopez had absconded and was back in Brewster. Likewise, Manchester did not inform Bower as to the reason for the inclusion of the prohibition against Lopez going to Brewster. Agent Bower testified that, had he known of these facts, he would have taken action to have Lopez immediately apprehended on the pending federal alien charges, or by reason of the violation of the Pretrial Diversion Agreement.

While there is a difference in the testimony between Mr. Manchester and Agent Bower, what *is* clear is that the officers of the INS, who were fully aware of the assaultive nature and propensities of Lopez, knew of his prior threats of death to Ms. Marin, knew of his complete breach of the Pretrial Agreement, and knew of his being back in Brewster, took no action at all to apprehend Lopez, to advise the Brewster Police Department of this fact, or to warn Ms. Marin. They failed to advise Mr. Beatty of these events. They failed to take any action at all that would lead to the apprehension of Lopez and the protection of the people of the community of Brewster and Ms. Marin.

Lopez shot and killed Maria Marin–Bobadilla in broad daylight on April 9, 1988, while she was sitting in a car stopped on a street in Brewster, Washington. She died approximately 15 minutes after being shot a number of times. Thereafter, on April 11, 1988, knowing that Lopez had murdered Ms. Marin, the Government dismissed the pending felony charge against Lopez.

The Government suggests that at the time of Ms. Marin's murder, the Brewster Police Department was aware that Lopez was back in that town due to a report allegedly made to Assistant Chief of Police Thurber by Jack Groeneveld. That contention was based upon Mr. Groeneveld's report of a prowler, who he thought acted like Lopez used to act, and upon Mr. Groeneveld's belief that he had seen Lopez in his labor camp. This information was not sufficient to put the Brewster Police Department on notice that Lopez was, in fact, back in Brewster. Even if they had been so informed, they had no federal jurisdiction over Lopez or authority to arrest him, the federal authorities having taken no action to warn anyone, issue a warrant, or apprehend Lopez when he totally breached the conditions of his Pretrial Diversion Agreement commencing on March 25, 1988. The failure of the INS agents to communicate with each other, to take any action to supervise or apprehend Lopez, or advise the Brewster police, Ms. Marin, or anyone else of Lopez's release, his absconding from supervision and his return to the Brewster area, were a proximate cause of Ms. Marin's murder.

The Government further suggests that the failure to advise Ms. Marin of Lopez's alleged return to Brewster was not a proximate cause of her murder, in that Ms. Marin was allegedly aware of Lopez's return to Brewster. The Government relies on the deposition testimony of Roberto Aguilar to the effect that several weeks prior to the murder, a male, believed by him to be Lopez, during the evening hours attempted to contact Ms. Marin. The evidence did not establish that Ms. Marin saw the individual involved before he was grabbed by Aguilar, or that she was informed that the individual was Lopez. Even if Ms. Marin had known that Lopez was back in town, she was not aware that he had been federally indicted, was released on condition that he not be in Brewster, or that he had absconded from the Government's supervision and was subject to arrest. Had Ms. Marin been informed of these facts, the court believes that Ms. Marin would have advised the supervising INS agents or the local police of Lopez's action and location, and certainly one would expect the Government to have taken some immediate and appropriate action to have Lopez apprehended.

Ms. Marin was a warm, caring, and attentive mother to her three sons. The father had abandoned the family and Ms. Marin was the sole source of adult care and support. Despite her full-time work, she devoted her available time to attending their school activities, including their athletic events. Her sons were successful in school, athletic, and church activities as a direct result of the support and encouragement of Ms. Marin. Ms. Marin spent the great majority of her off-work time with her children. As a result of their mother's murder, the three minor sons, Robert, Victor, and Luis, have each suffered severe emotional distress and a situational adjustment reaction. They have lost the daily care and attention provided by their mother. They have lost the moral and intellectual instruction, education, protection, support, love and guidance from the only parent available to fulfill these needs.

The great emotional loss felt by these three fine young boys was clear to the court during the testimony of each of them. One cannot miss the difference between the happy-go-lucky smiles of the boys in the photographs of them with their mother, in Exhibit 22, and the serious, somewhat withdrawn, nature of the young men during their testimony in court. The sincere grief of each of them is evident and clear. Despite the fact that their school and athletic activities are in the upper echelon and their work ethic is exemplary, that result is despite the fact that they continue to suffer emotionally from the loss of their mother. Their uncle and his wife, with whom they now live, have contributed greatly to the partial adjustment these outstanding young men have made to their tragic loss.

■ At the end of the court's oral opinion, counsel were asked by the court to submit supplemental Memoranda on the issue of the term to be considered in the loss of consortium claim, to wit: whether the loss of parental consortium is limited to the term of the minority of the three sons, or whether the appropriate period extends beyond their minority. The Plaintiffs have established clear authority that, in the State of Washington, the loss of consortium period does not end upon a child reaching his or her majority. In

*Ueland v. Pengo Hydra–Pull Corp.,* 103 Wash.2d 131, 691 P.2d 190 (1984), the Supreme Court of State of Washington, at page 140, recognized that the rule in this State is that in wrongful death actions, a child is entitled to recover damages for the loss of parental consortium beyond the period of minority. *See also, Kramer v. Seattle Auto Freight, Inc.,* 43 Wash.2d 386, 397, 261 P.2d 692 (1953). The Defendant has not disputed this contention.

The court also asked counsel to submit additional information and authorities as to the amount of awards in other cases for loss of parental consortium. Both sides have done so. The Plaintiffs contend that, based upon their submittals in Ct.Rec. 55, the average award in such cases is some $165,000 per child. The Defendant has not submitted any additional historical data, but contends that the Plaintiffs' information establishes an average award of somewhat less than $165,000 per child. The Plaintiffs seek an award of $250,000 per child and the Defendant argues that the award should be $100,000 per child.

■ The court concludes that the parental loss suffered by the minor Plaintiffs as a result of the murder of their mother was greater than an average loss suffered by children, if such a loss could ever be considered "average." As stated above, Ms. Marin was the sole parent providing the love, care, protection, guidance, and moral training for her sons. Ms. Marin was a unique person. Her sole interest in life appeared to be devoted to her work, to provide the entire monetary support for her sons, and the remainder of her time was devoted to these sons, including complete participation and guidance in their school, church, and athletic activities. I conclude that each of the minor sons of Ms. Marin, Robert Vargas Marin, Victor Vargas Marin, and Jose Luis Vargas Marin, should be awarded the sum of $200,-000 for the loss of their parental consortium with their mother, Maria Marin.

■ During the trial of this matter, counsel advised the court that there were minimal differences in the opinions of the economic experts as to the monetary losses suffered by Ms. Marin's estate. The undisputed funeral

expenses were in the amount of $2,629.65. The gross income lost from the date of Ms. Marin's death on April 9, 1988 to July 1, 1992 is $47,598. The appropriate consumption rate assigned to Ms. Marin with three children in her home is 30 percent. Thus, the net income loss to the estate of Ms. Marin to July 1, 1992 is $33,318. In computing the loss of future income, the court finds the following figures to be appropriate:

1. Wage rate growth . . . . . . . . . . . . . . . . 4.5%
2. Discount rate . . . . . . . . . . . . . . . . . . . . . 6.0%
3. Consumption rates:
 a. Three children at home . . . . . . . . 30%
 b. Two children at home . . . . . . . . . 35%
 c. One child at home . . . . . . . . . . . 45%
 d. No children at home . . . . . . . . . . 85%

Utilizing the foregoing figures, the present value of the lost future income is $69,043.00. The present value of both past and present lost household services is $59,315.

The decedent, Maria Marin, survived and was conscious for some 15 minutes after suffering multiple gunshot wounds at the hands of Lopez. The sum of $15,000 is a reasonable sum to be award the estate of Ms. Marin for the pain, suffering, and emotional distress which she suffered prior to her death.

Based upon the foregoing, the present value of the monetary losses suffered by the estate of Maria Marin are:

| | | |
|---|---|---|
| 1. | Funeral expenses | $ 2,629.65 |
| 2. | Lost income to 7/1/92 | $ 33,318.00 |
| 3. | Loss of future income from 7/1/92 | $ 69,043.00 |
| 4. | Loss of household services | $ 59,315.00 |
| 5. | Pain & suffering to decedent | $ 15,000.00 |
| | TOTAL | $179,305.65 |

## DISCUSSION

The Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., provides in § 2674 that "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." It is not disputed that the rule of law which determines this case, other than the issue of the discretionary function exception, is that of the State of Washington. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978).

On September 30, 1991, this court entered its Memorandum Opinion (Ct.Rec. 19) on the Defendant's Motion To Dismiss, which held that the Government was entitled to dismissal with prejudice, as a matter of law, on the portion of the Plaintiffs' claim that was based upon the decision of Mr. Beatty and Mr. Manchester to utilize Lopez as an agent and to have him released pursuant to the Pretrial Diversion Agreement. While a close question and one that could readily be challenged, this court held that such a decision fell within the discretionary function exemption set forth in 28 U.S.C. § 2680(a). The court, however, denied the Motion to Dismiss as that motion related to Plaintiffs' claims based upon the failure to supervise Lopez, or to warn Ms. Marin or the Brewster Police that Lopez had absconded and was reportedly seen back in Brewster.

On March 31, 1992, the court denied the Defendant's Motion for Summary Judgment, which sought dismissal of the remaining claim of negligent supervision of Lopez (Ct. Rec. 44). In that rather lengthy Opinion (47 pages), the court reviewed the law of the State of Washington as it relates to the negligence of persons charged with the responsibility of supervising persons such as Lopez, and also thoroughly reviewed the current state of the law concerning the discretionary function exemption. That Opinion is therefore incorporated herein as though fully set forth *haec verba*.

Recognizing, without conceding, the clear negligence on the part of the INS officer(s) in failing to take any appropriate action to supervise the violent person, Lopez, who was in their charge, and in apparent recognition of the resultant liability under Washington state law as established in *Taggart v. State of Washington*, 118 Wash.2d 195, 822 P.2d 243 (1992), the Government primarily defends this case on the basis of the discretionary function exception to the FTCA, set forth in 28 U.S.C. § 2680(a). This exception provides that the FTCA does not render the United States responsible for an act or omission of an employee of the Government based upon the exercise or performance of, or the failure to exercise or perform, a discretionary function or duty on the part of a federal agency

or an employee of the Government, whether or not the discretion involved be abused.

The *Taggart* case established the rule of law in the State of Washington that where the State has undertaken the responsibility for the supervision of persons with dangerous propensities, it is liable if it is negligent in that supervision, and if the injury to persons was a reasonable consequence of the breach of that duty. The court further held that the scope of this duty was not limited to readily-identifiable victims, "but includes anyone forseeably endangered" by the condition of the person being supervised.

In *Taggart*, the Plaintiffs were injured by assaults by parolees, and the evidence established that the supervising parole officers were aware of the dangerous propensities of the parolees. The Washington State Supreme Court, at page 220, 822 P.2d 243 stated:

> parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress during paroles. Because of these factors, we hold that parole officers have "taken charge" of the parolees for purposes of § 319 (Restatement, Second, of Torts). When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm.

The State Supreme Court, at page 223–24, 822 P.2d 243, of *Taggart*, rejected the Defendants' claim that the duty to warn or protect others only applies to custodial circumstances. The court stated:

> We reject this approach and hold that a parole officer takes charge of the parolees he or she supervises despite the lack of a custodial or continuous relationship. . . .
>
> . . . We hold that a parole officer may "take charge" of a parolee, thereby assuming the duty to protect against reasonably foreseeable dangers, despite the absence of a custodial relationship and without exercising the "continuing hourly or daily dominance and dominion" over that parolee the

*Fox [v. Custis*, 236 Va. 69, 372 S.E.2d 373 (1988) ] court required. . . .

> We conclude that parole officer have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities.

In this case, it is clearly established that the INS officers took charge of Lopez to an equal, if not greater, extent as did the state parole officers in *Taggart*. Lopez was released from custody at the urging of the INS officer in charge, Mr. Manchester. The Taggart parolees were not released by their supervising officers, but rather were released by an independent body, the Indeterminate Sentence Review Board. The INS officers and agents in this case undertook not only to supervise Lopez, but determined to make him their agent for alleged undercover work.

The role assumed by the INS in this case involved even greater contact and supervision of Lopez than the roles of the state parole officer in the Taggart case. The INS officers, knowing that Lopez had previously assaulted Ms. Marin, had threatened to kill her, and was in possession of firearms during such assaults, had an even greater duty to warn and protect Ms. Marin than did the state officers in Taggart in their general supervisory roles, particularly after the agents knew that Lopez had absconded and returned to Brewster.

The Washington State Supreme Court, in *Taggart*, at page 213, 822 P.2d 243, also established the rule that, in a supervisory role, parole officers are not entitled to either judicial or quasi-judicial immunity. The court held "when the officer takes purely supervisory or administrative actions, no such protection arises."

The *Taggart* court, at page 216, 822 P.2d 243, did hold that, in limited circumstances, state officers may be entitled to qualified immunity. However, to qualify for this immunity, the officers must have been carrying out a statutory duty and their actions must have been in substantial compliance with the directives of superiors and relevant statutes or regulatory guidelines. In this case, there is no contention by the Government that the INS officers were acting pursuant to statutory duties or under the directions of their

superiors. To the contrary, it has been the position of the Government that "[t]here are no mandatory statutes, regulations or policies that control the manner in which the INS handles an illegal alien who is released as an informant." See § 6, page 13 of Defendant's Proposed Findings of Fact and Conclusions of Law. At § 21 page 17 of the same pleading, the Government contends that the INS Handbook does not contain binding directives to the Agents. This position is inconsistent with the Government's litigation position in this case, that being that the actions of the INS agents in the supervision of Lopez fell within the discretionary function exemption of the FTCA. As such, the Agents and the Government are not entitled to qualified immunity under Washington State Law.

It is puzzling to this court that the Government, in its proposed Findings of Fact and Conclusions of Law, which also constituted its trial brief, failed to make any attempt to distinguish *Taggart*, and, in fact failed to even mention the case, even though this court had, in its Memorandum Opinion and Order Denying Defendant's Motion for Summary Judgment (Ct.Rec. 44), filed March 31, 1992, pointed out its existence and applicability. Instead, the Defendant relied upon a decision by a lower appellate court of the State of Washington, *La Vern Donaldson v. City of Seattle*, 65 Wash.App. 661, 829 P.2d 1125, withdrawn (1992), republished with dissenting opin. at 831 P.2d 1098, which did not cite the *Taggart* decision of the Washington State Supreme Court. The *Donaldson* court merely held that the City of Seattle could not be held liable for the failure of a police officer to conduct a follow-up investigation. Such a holding is a far cry from a holding that there is no duty to take action where an officer has undertaken a supervisory role of a known violent felon. The *Taggart* decision is to the contrary.

As indicated, the Government relies upon the discretionary function exception in an attempt to avoid responsibility for the negligence of the INS agents and the death of Ms. Marin. Of interest to this court is the fact that the *Taggart* court recognized that a discretionary governmental immunity exception also exists under the law of the State of Washington. While federal law controls the discretionary function exemption decision in this case, the State of Washington discretionary function exemption has the very same basis as the federal exemption, that being that this exemption applies to policy decisions as opposed to "ministerial" or "operational" acts which are not so exempted. *Taggart*, 118 Wash.2d at page 214, 822 P.2d 243. The *Taggart* court held that the discretionary function exception does not shield parole officers from claims alleging negligent supervision, even though parole officers' supervisory decisions require the exercise of discretion. The court stated that "the discretionary immunity exception applies only to basic policy decisions and parole officers' supervisory decisions, however much discretion they may require, are not basic policy decisions." *Id.* at 215, 822 P.2d 243.

## FEDERAL DISCRETIONARY FUNCTION EXCEPTION

The federal discretionary function exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). Based on separation of powers concerns, the exception reflects Congress's wish to "prevent judicial second-guessing of legislative and administrative decisions *grounded in social, economic, and political policy* through the medium of an action in tort." (Emphasis supplied.) *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984) (*Varig Airlines*).

Several Supreme Court decisions have developed the contours of the discretionary function exception: *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Varig Airlines, supra; Berkovitz, supra*, and most recently, *United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

First, the Court established that it is the nature of the conduct, rather than the status of the actor, that is significant. *Varig Air-*

lines, *supra* 467 U.S. at 813, 104 S.Ct. at 2764. In 1988, the Supreme Court set forth a two-part test in an attempt to assist the lower courts in determining the elusive question of what is and what is not a discretionary function. *Berkovitz, supra.*

First, the court must consider whether the challenged conduct is a matter of choice for the acting employee because conduct cannot be discretionary unless it involves an element of judgment or choice. *Id.* 486 U.S. at 536, 108 S.Ct. at 1958. Thus, "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.*

Secondly, the Court stated that if there is no such federal directive, the court must then determine whether the discretionary judgment is of the kind that the discretionary function exception was designed to shield. *Id.* at 536–37, 108 S.Ct. at 1958–59. The purpose of the exception was defined by the Court in *Varig Airlines, supra,* as being Congress's desire to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy ..." *Id.* 467 U.S. at 814, 104 S.Ct. at 2765. "The exception, properly construed, therefore protects only governmental actions and decisions *based on considerations of public policy.*" (Emphasis supplied.) *Berkovitz, supra* 486 U.S. at 537, 108 S.Ct. at 1959.

If the conduct is discretionary *and* grounded in regulatory policy, the discretionary function exception applies, even if the discretion is abused. 28 U.S.C. § 2680(a). Abuse of discretion "connotes both negligence and wrongful acts in the exercise of discretion ... [t]he exercise of discretion could not be abused without negligence or a wrongful act." *Dalehite supra,* 346 U.S. 15, 73 S.Ct. 956. Whether there are allegations of negligence is irrelevant to the discretionary function inquiry. *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1029 (9th Cir. 1989). Rather, each act of alleged negligence must be evaluated separately. In sum, the discretionary function exception insulates the Government from liability if the challenged action "involves the permissible exercise of policy judgment." *Berkovitz, supra* 486 U.S. at 537, 108 S.Ct. at 1959.

The Ninth Circuit has recently held that the Government bears the burden of affirmatively establishing the existence and applicability of the discretionary function exception to the FTCA's general waiver of immunity. *Prescott v. United States,* 959 F.2d 793 (9th Cir.1992).

The Ninth Circuit utilized the *Berkovitz* analysis in *Kennewick Irrigation Dist., supra,* a case arising in this district. There, the Kennewick Irrigation District sued the United States for damages arising out of two breaks in Kennewick's main irrigation canal, which was designed by the United States Bureau of Reclamation. The breaks were caused by a phenomenon called "piping" whereby water eroded the sides of the canal and eventually caused breaks in the canal. A United States Magistrate Judge found that the Bureau's failure to line the canal with concrete and take other preventative measures in the design and construction of the canal fell outside the discretionary function exception. The Magistrate Judge then found that negligence in both the design and the construction of the main canal were the proximate cause of the canal breaks.

The Ninth Circuit pointed out the difference between a policy decision, where the exception applies, and a non-policy decision, where it does not. The court applied the *Berkovitz* test first to the design decision. The court found that there was no mandatory, specific statute, regulation, or policy regarding the design of the canal. Secondly, the court found that "the Bureau's decisions in designing the Kennewick canal involved not merely engineering analysis but judgment as to the balancing of many technical, economic, and even social considerations." *Kennewick, supra* at 1029. Therefore, the court concluded that the Bureau's design decisions were protected under the discretionary function exception.

The court then turned to the claim of negligence in the construction of the canal and again applied the two-part *Berkovitz*

test. First, the court found that the discretion involved in the construction decisions was not removed by way of specific statute or regulation, and again turned to the question of whether the discretion involved the weighing of social, economic and political policy considerations. *Kennewick*, at 1031. The court found that the construction decisions were based not on policy judgments, but on technical, scientific, and engineering considerations, and were, therefore, not protected discretionary functions.

In *Summers v. United States*, 905 F.2d 1212 (9th Cir.1990), a second post–*Berkovitz* case dealing with the discretionary function exception, the Golden Gate National Recreation Area, operated by the National Park Service, failed to warn of the dangers of stepping on hot coals in fire rings. The Park Service and Department of Interior had specific regulations concerning visitor safety. However, the court found that the failure to warn did not contravene a prescriptive federal statute, regulation, or policy, and therefore turned to the question of whether the failure to warn reflected the exercise of judgment *grounded in social, economic or political policy. Id.* at 1215.

The Park Service had a sign policy that "limits park signs to the minimum number and size necessary for adequate warning and guidance to the public in order to conserve the scenery of the parks for future visitors." The Government argued that the decision not to provide a warning sign was within broad discretionary authority to balance the demands of promoting public use of national parks and to preserve them for the enjoyment of future generations. The court found the failure to provide a warning sign was not within the discretionary function exception. The Ninth Circuit reasoned that:

> a *governmental failure to warn is not necessarily shielded from suit because a discretionary function is some way involved.* On the contrary, we have concluded that "where the challenged governmental activity involves safety considerations under an established policy, rather than the balancing of competing policy considerations, the rationale for the exception falls

away and the U.S. will be responsible for the negligence of its employees.

*Id.* at 1215 (citing *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987)) (emphasis added). The court emphasized that the failure to warn involved safety considerations, rather than economic, social, or political judgments.

> [T]he failure to identify and warn of the danger to barefoot visitors of hot coals on park beaches resembles more a departure from the safety considerations established in Service policies ... than a mistaken judgment in a matter clearly involving choices among political, economic and social factors.

*Id.* at 1216. The court finds that the same rationale applies in this case.

*Federal Statute, Regulation or Directive*

Following the two-step *Berkovitz* test, the first inquiry here is "whether the challenged action is a matter of choice for the acting employees. In other words whether there was any established federal statute, regulation, or policy directing agents to take any steps to control the informant, or warn and/or protect the known potential victim from the known dangerous propensities of the released informant, when federal agents have an informant released from custody, knowing of the informant's history of violent assaults and death threats against a particular victim, and having learned that the informant has never complied with even one condition of the diversion agreement.

Defendant argues that the Plaintiffs have found no statutes, regulations or mandatory directives that required the Government to warn and/or protect a private citizen, like Ms. Marin, when an informant is released from custody under the circumstances of this case. Defendant cites *Taitt v. United States*, 770 F.2d 890 (10th Cir.1985); *Piechowicz v. United States*, 685 F.Supp. 486 (D.Md.1988), *aff'd*, 885 F.2d 1207 (4th Cir.1989); and *Redmond v. United States*, 518 F.2d 811, 816 (7th Cir.1975) as holding that "absent a specific statute or regulation requiring the Federal Government to warn and/or protect private citizens, and absent the government's undertaking so to warn or to protect, the

discretionary function exception is applicable." However, all of those cases are very distinguishable from the instant case.

■ In *Taitt*, plaintiff claimed that the defendant had admitted a person into the witness protection program with knowledge of his past violent behavior, without a psychological evaluation, and without prior notification to law enforcement officials regarding his release. The court found that by federal statute, the Attorney General was given the discretion to provide for witness protection "whenever, in his judgment, testimony from, or a willingness to testify by such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy." *Id.* at 893. "The only guiding criteria for admission to the WPP program on the face of the statute is that the Attorney General determine that the witness or his family to be in danger as a consequence of his testimony. Such a decision is within the Attorney General's discretion." *Id.* Here, the Government points to no statute clearly giving the agents such discretionary power in a case such as this. This court has found that the decision to release Lopez to work as an informant, even though a questionable decision, falls within the discretionary function exception. The negligent supervision and failure to warn a known target and the police after the informant has absconded does not.

*Piechowicz, supra,* is distinguishable in that there, the court found that the state agent defendants were "unaware that the claimants, as distinguished from the public at large, faced any special danger." *Id.* at 486. Here, it is clear that the agents were aware that Ms. Marin faced danger at the hands of Lopez, as distinguished from his being a danger to the public at large. In *Redmond, supra* "the sole issue was whether Redmond's claim [was] barred by the 'misrepresentation exception' to the Federal Tort Claims Act, which is not an issue here.

INS agents are provided with the Service Investigator's Handbook. Defendant correctly contends that there is a statement on the first page that "The uses of informants are limited only to the imagination of the investigator." The Government contends that the INS Handbook contains only guidelines, rather than mandatory directives. The Government is correct that the Handbook says nothing about warning a potential victim when a prisoner is released to work as an informant. Plaintiffs have pointed to no statute, regulation or directive of any kind requiring the Government to warn a potential victim in a case such as this. In *Jacobo v. United States,* 853 F.2d 640 (9th Cir.1988), the plaintiff claimed that the Navy was negligent *per se* because it violated the Naval Ships Technical Manual, which places a duty on the commanding officer of a vessel to assure that others conduct their operations according to applicable standards and laws. The court first held that the alleged failure of the commanding officer to comply with the naval manual would not provide a basis for *negligence per se* (emphasis added). The court stated that the navy manual "is not a regulation and does not have the force of law." *Id.* at 641. However, the plaintiff also alleged that the United States was negligent, relying on *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The court noted that under *Scindia,* the United States had a duty to warn of any dangers of which it knew or should have known. However, the *Jacobo* plaintiff had presented no evidence to show that the Navy knew or should have known of the danger. *Jacobo, supra* at 642. Here, it is not disputed that the agents knew of the potential danger to Ms. Marin at the hands of Lopez.

*Social, Economic and Political Policy*

There being no federal statute or regulation mandating a duty to warn in these circumstances, under *Berkovitz, supra,* the court must therefore determine whether the decision here to warn and/or protect or not is grounded in social, economic, and political policy. The INS Handbook strongly emphasizes that the control of informants and the reporting system is imperative. Nevertheless, it is clear that the agents made no effort whatsoever to supervise or control Lopez after he was released. Even when he failed to report, they made no effort to determine whether he had returned to Brewster. Addi-

tionally, after they knew both that Mr. Lopez had not reported, and that he had been seen in Brewster, they took no action other than to notify his attorney of this fact. They failed to notify Mr. Beatty, failed to seek an arrest warrant, and failed to warn, or do anything to protect the known potential victim. Thus, like the situation in *Summers,* 905 F.2d 1212, *supra,* the agents' failure to take any action to apprehend Lopez and/or warn Ms. Marin of the known danger involved basic safety considerations in the supervision of Lopez, rather than the balancing of competing policy considerations.

> Under prong two of the *Summers* inquiry, for the discretionary function exception to apply, the United States must prove that each and every one of the alleged acts of negligence (1) involved an element of judgment and (2) the judgment was grounded in social, economic, or political policy.

*Prescott v. United States, supra* at 799. The court finds that the Government has not done so.

The court is satisfied there is no economic, political, or social consideration in failing to keep control over an informant with a known propensity for violent behavior against a known victim, who had been released from custody on a felony charge at the request of the supervising agents, and who was in violation of every condition of the release agreement, without at least warning the potential victim and the local police.

■ Nevertheless, Defendant contends that secrecy is an integral part of an undercover operation, and that not apprising the Brewster police or Ms. Marin of Lopez's release was in order to (1) ensure Lopez's safety; (2) maintain the sanctity of an investigation; and (3) avoid the impediment of any other ongoing, albeit unknown, investigations being undertaken by other federal authorities. Therefore, the Government argues, the decision to maintain the secrecy of Mr. Lopez's release and whereabouts was based on social, economic, and political policies and cannot be judicially second-guessed regardless of whether that discretion was abused. Because this argument is not established by the facts of this case or the law, it must fail.

Defendant cites *Frigard v. United States,* 862 F.2d 201, 203 (9th Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989); *Georgia Cas. & Sur. Co. v. United States,* 823 F.2d 260, 263 (8th Cir. 1987); and *Boyle v. United Technologies Corp.,* 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988) in support of its argument that the secrecy of undercover operations is based on strong public policy considerations. However, these cases are factually distinguishable from the case at bar. None of the cited cases deals with the failure to warn a known target of a known danger after the would-be informant, with a known history of assaults and death threats against the target, has absconded and, in fact, never in any manner acted as directed.

None of the cases cited by the Government involved a situation where Government agents released a person from custody on a felony charge to work as an informant, knowing, not only that he was an illegal alien, but also that he had been convicted of assaulting a particular victim and had threatened to kill her. The cited cases also did not involve the circumstance of a known violent person being released under specific instructions which the agents knew were necessary to protect a known person where the agents then learned that the informant had not complied with those directives, but did not initiate any efforts to have the violator apprehended, and did nothing to warn a known potential victim of a known danger. All of the cited cases dealt with effective undercover operations in progress. Lopez was not operating as an undercover agent or informant when he failed to report, failed to go to Yakima, absconded, and returned to Brewster against direct orders.

The court is satisfied that the failure to warn in this case was not due to a trade-off between greater safety and greater informant effectiveness. Clearly, the INS knew that Lopez was not effective, had absconded, and returned to the scene of his prior assaults and threats, the town in which his past and future victim resided.

Defendant's argument, that secrecy is a necessary policy judgment when using a confidential informant, fails under the facts of

this case. Defendant contends the agents did not warn the Brewster Police because of Lopez's allegation that a Brewster policeman was involved in illegal drugs. This contention is not supported by the evidence. It is clear that neither the DEA nor the INS thought that Lopez's varying "dirty policemen" claims were sufficient to instigate an investigation in Brewster. It is also clear that Lopez was not involved in a Brewster investigation. The agents clearly knew that Lopez had not reported as directed and that he had returned to Brewster, despite the directive and conditions of release not to do so. They further knew that Lopez had been convicted of assaulting Ms. Marin and had threatened to return to Brewster to kill her. The court finds there is no policy necessitating secrecy in a situation such as this, especially where the informant had absconded and the agents had determined to terminate their agreement with Lopez to use him as an informant. Therefore, the need for secrecy, if any, had terminated long before Ms. Marin's murder. The court is satisfied that, under these circumstances, the discretionary function exception does not apply to the failure to supervise, warn and/or apprehend claims.

## LIABILITY UNDER WASHINGTON LAW

■■ The Defendant also contends that there is no analogous private liability in Washington under which the Government can be held liable for the failure to warn and/or protect Ms. Marin or the Brewster Police Department. This court disagrees. As previously stated, this court finds that the case of *Taggart v. State*, 118 Wash.2d 195, 822 P.2d 243 (1992) establishes a cause of action under Washington law for the failure of officers to supervise, particularly where the individual is a known violent person who has previously threatened to kill, and has assaulted, a specific victim.

■ In FTCA actions, the substantive law of the state where the injury occurred is controlling. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978). Having found that the Defendant is not entitled to the benefit of the discretionary function excep-

tion, the Government agents, acting within the scope of their employment would be liable, if under like circumstances a similar person would be liable in accordance with the law of Washington. 28 U.S.C. § 1346(b).

In *Louie v. United States*, 776 F.2d 819 (9th Cir.1985) the court looked at the issue of whether a government agent had a duty to control an off-duty serviceman that would give rise to liability under the FTCA, based on an application of Washington law. "[A] determination of the government's liability under Washington law in this case rests properly on an examination of the liability of the state or a municipality under like circumstances." *Id.* at 825. Likewise, to determine whether a federal law enforcement agency can be held liable under Washington law here requires examination of the liability of a state or municipal law enforcement agency under like circumstances.

Under Washington law, the questions are (1) whether there is a duty to warn and/or protect a known victim of a known danger, and (2) if so, whether a law enforcement agency has such a duty under the "Public Duty Doctrine" which is recognized in Washington.

### *Duty to Warn*

It is well established that an essential element in any negligence action is the existence of a legal duty which the defendant owes to the plaintiff. *See, e.g. Baerlein v. State*, 92 Wash.2d 229, 231, 595 P.2d 930 (1979); *Haslund v. Seattle*, 86 Wash.2d 607, 611 n. 2, 547 P.2d 1221 (1976). Defendant argues that there is no duty to warn a potential victim upon the release of a criminal when the victim is cognizant of the criminal's release from custody and his dangerous propensities, citing *Hawkins v. King County*, 24 Wash.App. 338, 602 P.2d 361 (1979). In *Hawkins*, a prisoner was released from custody and 8 days later assaulted his mother. The plaintiffs sued Hawkins's court-appointed attorney, contending he was negligent and had committed malpractice by failing to divulge to the court, at a bail hearing, information regarding his client's mental state. The *Hawkins* court found that the potential victims knew Hawkins might be dangerous and

knew he had been released. The court held that "[t]he common-law duty to volunteer information about a client to a court considering pretrial release must be limited to situations where information gained convinces counsel that his client intends to commit a crime or inflict injury upon unknowing third persons." *Id.* at 345, 602 P.2d 361. The court emphasized that the attorney had no information that Hawkins planned to assault anyone.

The *Hawkins* court clearly balanced the safety concerns against the need for maintaining attorney/client confidentiality. In looking at plaintiffs' theory of a common-law duty to warn, the court noted that the Washington Supreme Court has made clear that there is common-law support for precepts that attorneys must, upon learning that a client plans assault or other violent crime, warn foreseeable victims, and that the duty of confidentiality may be limited when values protected by that duty are outweighed by other interests necessary to administration of justice. However, public interest in safety from violent attack must be weighed against public interest in securing proper resolution of legal disputes, without compromising defendant's right to loyal and zealous defense. *Id.* at 343–44, 602 P.2d 361.

Here, as previously stated, there is nothing in the record to support a claim that the INS agents consciously balanced the necessity of keeping Lopez's whereabouts and activities a secret, against the known safety hazards to a known potential victim.

 Under the common law, a person had no duty to prevent a third party from causing physical injury to another. *Petersen v. State*, 100 Wash.2d 421, 426, 671 P.2d 230 (1983). However, Washington has recognized an exception to this rule of nonliability where a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct. *Id.* Defendant here does not dispute that Ms. Marin was a foreseeable victim. Additionally, the court is satisfied that there was a special relationship between the agents and Lopez. The *Petersen* Court cited to the Restatement (Second) of Torts for the general rule of nonliability and its exceptions:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to perfection.

Restatement (Second) of Torts § 315 (1965).

In *Petersen*, the issue was whether a State psychiatrist who released a patient, knowing that the patient was on probation, and that the patient had an extensive history of drug abuse and mental disease, had a duty to protect potential victims from the dangerous propensities of the released patient. The State raised a number of issues including (1) whether the psychiatrist had a duty to protect the plaintiff from the dangerous propensities of the patient, and (2) if so, whether the State was immune from liability for breach of that duty. The court recognized that some courts had limited the scope of such a duty to warn to a readily identifiable victim, whereas other courts had required only that the defendant could reasonably foresee that the risk would endanger others. The court concluded that the psychiatrist incurred a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by the patient's drug-related mental problems.

Having found that the State had a duty to take reasonable precautions to protect against the dangerous propensities of a state hospital mental patient, the court turned to the question of whether the State was immune from liability for breach of the duty, due to discretionary policy decisions. "Discretionary governmental immunity, however, is an extremely limited exception." *Id.* at 433, 671 P.2d 230 (citing *Haslund v. Seattle*, 86 Wash.2d 607, 619, 547 P.2d 1221 (1976)).

Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must

make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*Id.* 100 Wash.2d at 434, 671 P.2d 230; *King v. Seattle,* 84 Wash.2d 239, 525 P.2d 228 (1974).

The *Petersen* court cited *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb. 1980), where the court rejected the government's contention that negligent implementation of the Veterans Administration's policy on detention of potentially dangerous patients fell within the discretionary function exception to the Federal Tort Claims Act. *Id.* 100 Wash.2d at 434, 671 P.2d 230. *See also Jablonski ex rel. Pahls v. United States,* 712 F.2d 391 (9th Cir.1983), where the court found that under California law, Veterans Administration psychiatrists owed a duty to a patient's girlfriend to warn her as a foreseeable victim of the patient's violence where, even though the patient had made no specific threats concerning any specific individuals, his previous history indicated that he would be likely to direct his violence against his girlfriend.

The Washington Supreme Court decision in *Taggart v. State,* 118 Wash.2d 195, 822 P.2d 243 (1992), provides considerable guidance. In that case, plaintiff Taggart brought claims of negligent parole release and supervision, and plaintiff Sandau brought claims of negligent parole supervision against the State and its agents after each plaintiff had been injured by parolees in separate assaults.

The Court first found that although the Indeterminate Sentence Review Board is absolutely immune under the doctrine of judicial immunity for its decisions to deny, grant, or revoke parole, a claim against a parole officer for failing to supervise a parolee is not protected by the doctrine of quasi-judicial immunity. Next the Court held that such a claim is not barred by the discretionary immunity exception to the State's waiver of sovereign immunity.

In the present case, we hold that the discretionary immunity exception does not shield parole officers from claims alleging negligent supervision. We recognize that parole officers' supervisory decisions require the exercise of discretion. The crucial point, however, is that the discretionary immunity exception applies only to basic policy decisions. Parole officers' supervisory decisions, however much discretion they may require, are not basic policy decisions.... Therefore, even if the discretionary immunity exception applies to the Board's release decisions, an issue we have found it unnecessary to resolve, the exception does not shield parole supervision decisions.

*Taggart,* at 215, 822 P.2d 243.

The Court found that parole officers are qualifiedly immune from liability for claims of negligent parole supervision if their actions are in furtherance of a statutory duty and are in substantial compliance with the directives of superiors and relevant regulatory guidelines. Here, the Government does not contend that the failure to warn was in furtherance of a statutory duty, or in substantial compliance with directives of superiors and relevant regulatory guidelines. The court is satisfied that under *Taggart,* Defendant's claim that there is no duty to warn a known potential victim of a known danger must fail.

### Public Duty Doctrine

 The Defendant argues that the Government did not owe a legal duty to Ms. Marin under the Washington State Public Duty Doctrine. The court finds that this claim must fail as well. The public duty doctrine provides that "no liability may be imposed for a public official's negligent conduct unless it is shown that the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general." *Taylor v. Stevens Cy.,* 111 Wash.2d 159, 163, 759 P.2d 447 (1988). However, numerous exceptions to the doctrine are recognized. *Bailey v. Town of Forks,* 108 Wash.2d 262, 268, 737 P.2d 1257 (1987). These exceptions generally embody traditional negligence principles, and may be used as "focusing tools" to

determine whether the public entity had a duty to the injured plaintiff. *Taylor, supra,* 111 Wash.2d at 166, 759 P.2d 447. An entity performing governmental functions may be held liable where the plaintiff demonstrates that an otherwise general duty to the public has focused on the particular plaintiff and the entity breaches that duty. *Champagne v. Spokane Humane Society,* 47 Wash.App. 887, 737 P.2d 1279 (1987); *Hartley v. State,* 103 Wash.2d 768, 782–83, 698 P.2d 77 (1985).

The public duty doctrine is closely related to governmental immunity. In 1961, the Washington Legislature announced a change in the public policy of Washington by enacting RCW 4.92.090, which abolished governmental immunity in actions against the State for tortious conduct. Likewise, in 1967, the Legislature adopted RCW 4.96.010, decreeing that municipal corporations "shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers ... to the same extent as if they were a private person or corporation." However, the Washington Court of Appeals has held the Legislature's abolition of sovereign immunity (RCW 4.96.010) did not abrogate the public duty doctrine. *Garnett v. City of Bellevue,* 59 Wash.App. 281, 285, 796 P.2d 782 (1990), *rev. denied,* 116 Wash.2d 1028, 812 P.2d 102 (1991).

"The public duty doctrine recognizes that a fundamental element of any negligence action is a duty owed by the defendant to the plaintiff." *Meaney v. Dodd,* 111 Wash.2d 174, 178, 759 P.2d 455 (1988).

Thus to recover from a municipal corporation in tort it must be shown that the duty breached was owed to the injured person as an individual and was not merely the breach of a duty owed to the general public (because a duty to all is a duty to no one). The concept of the public duty doctrine therefore, is that a duty is owed to the public at large unless it can be established that the duty is owed to a particular individual.

*Lewis v. City of Mercer Island,* 61 Wash. App. 1044, 63 Wash.App. 29, 817 P.2d 408 (1991), *rev. denied,* 117 Wash.2d 1024, 820 P.2d 510.

Nevertheless, the Washington Supreme Court has indicated its disfavor of the public duty doctrine, and has questioned whether it violates the directives of the Legislature in RCW 42.92.090.

The standard rationales offered to support continued reference to the public duty doctrine are the risk of excessive governmental liability and the need to prevent interference with governmental process. (cite omitted). The doctrine is also viewed as a mechanism for focusing attention on whether the governmental agency owed a duty to the particular plaintiff, rather than the public as a whole (cite omitted). On the other hand, continued reiteration of the doctrine has been attacked as perpetuating sovereign immunity in the guise of the public duty doctrine. (cites omitted). One commentator persuasively argues that in abrogating sovereign immunity for tortious conduct, the Legislature rejected the same standard rationales now put forth to support the public duty doctrine. (cite omitted). In effect, the public duty doctrine places in this court's hands the task of determining as a matter of "public policy" when a duty of care exists on the part of public employees. This raises the difficult question as to whether affording special protection to agents of the government violates the Legislature's directive, which requires governmental bodies to be liable in tort "to the same extent as if they were a private person or corporation." RCW 4.96.010. *See also* RCW 4.92.090. In addition, injured plaintiffs suffer harshly under the doctrine, a result that may have played a role in the various exceptions this court has carved out of the "no duty" rule. (cites omitted.)

*Close inspection of the doctrine and its myriad exceptions may well reveal that the exceptions have virtually consumed the rule.*

*Bailey v. Town of Forks,* 108 Wash.2d 262, 267, 737 P.2d 1257 (1987) (emphasis added).

The court in *Taggart, supra,* also addressed the Public Duty Doctrine.

The State argues that it owed no duty to Taggart or Sandau as opposed to the general public, and that therefore the public

duty doctrine bars their claims based upon negligent parole supervision. *We hold that the State has a duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities of parolees, and that if injury to Taggart and Sandau was a reasonably foreseeable consequence of paroling Brock and Geyman, then this duty extended to Taggart and Sandau.* *Id.* 118 Wash.2d at 217, 822 P.2d 243.

The Government seeks to distinguish *Petersen supra,* on the basis that there, the patient who caused the plaintiff's injuries was released from hospitalization by a treating psychiatrist, who knew of the patient's mental disturbances (citing *Baumgart v. Grant County,* 50 Wash.App. 671, 750 P.2d 271 (1988)). In *Baumgart,* a person injured in an automobile accident caused by a drunk driver sought damages from the county which had prematurely released the driver from jail 3 days before the accident. The court held that the county's release of the driver was not the legal cause of the accident. The court distinguished *Petersen,* noting that in *Petersen* the patient was "in custody" for the purpose of therapeutic treatment, while in *Baumgart,* the custody was simply punitive incarceration. "Also in *Petersen,* the patient was hospitalized for symptoms attributed to drug abuse, and at the time of the accident in which Mrs. Hartley was killed, the former patient was under the influence of drugs." *Baumgart* 50 Wash. App. at 676, 750 P.2d 271. "A police officer's mere contact with an intoxicated person hardly creates the same type of relationship as exists between a psychiatrist and his patient, or a custodian and his inmate." *Louie v. United States, supra,* 776 F.2d at 826.

However, subsequent to the *Baumgart* and *Louie* opinions, the Washington Supreme Court in *Taggart* found *Petersen* to be controlling, and that the duty announced in *Petersen* is not limited to taking precautions to protect against mental patients' dangerous propensities only when those patients are being released from the hospital. *Taggart,* 118 Wash.2d at 223, 822 P.2d 243. *Taggart* establishes that a parole officer has a special relationship with parolees, and that a claim against a parole officer for the failure to protect a victim from a parolee's foreseeable assault is not protected. The court stated:

As a preliminary matter, we note that a duty will be imposed under [the Restatement (Second) of Torts] § 315 only upon a showing of "definite, established and continuing relationship between the defendant and the third party." (cite omitted). Under RCW 72.04A.080, parolees "shall be subject to the supervision of the department of corrections, and the probation and parole officers of the department shall be charged with the preparation of progress reports of parolees and to give guidance and supervision to such parolees within the conditions of a parolee's release from custody." ... This statute is sufficient to establish that parole officers have a "definite, established and continuing relationship" with their parolees.

*Taggart, supra* at 219, 822 P.2d 243.

Here, as there, inmates released from custody to act as informants for a federal law enforcement agency are subject to the supervision of the agency, and the agents are responsible to give guidance and supervision to the informants. The court is satisfied that this is sufficient to establish that federal agents have a "definite, established and continuing relationship" with their informants.

The *Taggart* Court cited the Restatement (Second) of Torts § 319 which provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

The State can regulate a parolee's movements within the state, require the parolee to report to a parole officer, impose special conditions such as refraining from using alcohol or undergoing drug rehabilitation or psychiatric treatment, and order the parolee not to possess firearms. The parole officer is the person through whom the State ensures that the parolee obeys the terms of his or her parole. Additionally, parole officers are, or should be, aware of their parolees' criminal histories, and monitor or should monitor, their parolees'

progress during parole. Because of these factors, we hold that the parole officers have "taken charge" of the parolees they supervise for purposes of § 319. *When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm.*

*Id.* at 219–20, 822 P.2d 243 (emphasis added). The Court noted the extremely difficult supervisory tasks that parole officers must perform; however, the court concluded:

We hold that a parole officer may "take charge" of a parolee, thereby assuming the duty to protect against reasonably foreseeable dangers, despite the absence of a custodial relationship and without exercising the continuing hourly or daily dominance and dominion over that parolee ...

*Id.* at 223, 822 P.2d 243.

[The parolee] had an extensive criminal history that included violent assaults. He violated the conditions of his parole by quitting his job, changing his address without notifying his parole officer, failing to report to his parole officer, and absconding from parole. [The] parole officer knew of these violations, and knew as well that [the parolee] was reportedly drinking alcohol, which increased the risk of violent behavior, and beating Hazel and her children. A jury might conclude that it was reasonably foreseeable that unless [the parolee was] arrested for violating parole, he would commit further violence against Hazel and her children ... The fact that the violence took the form of raping Sandau, when Ceyman's criminal history did not include rape, does not show that injury to Sandau was not foreseeable. Violence against Sandau may have been foreseeable, even though the form of that violence may not have been.

*Id.* at 225, 822 P.2d 243.

The case here is nearly identical to that in *Taggart.* The INS agents, as the parole officers there, can regulate an informant's movements within the state, require the informant to report to the agents, and impose conditions. Additionally, Lopez had a crimi-

nal history that included violent assaults against Ms. Marin. He violated his diversion agreement by failing to report to his supervising Agents and by returning to Brewster. The INS Agents knew about Lopez's violations of the diversion agreement, as well as his criminal history, including assaults and threats of death directed toward the decedent.

The Government argues that *Taggart* does not apply because it dealt with claims of negligent supervision, and that this court has already found that a claim of negligent supervision is within the discretionary function exception. However, Defendant misinterprets the court's previous finding. The court held that the decision to utilize Lopez as an informant was within the discretionary function exception, and that the ongoing supervision was so excluded. In retrospect, this court probably erred in holding that the day-to-day supervision of an informant was protected by the discretionary function exemption. Be that as it may, this court did not hold that the failure to provide any warning to a known target of death threats, or the police department in the town of residence of that target, was within the exception. The court held to the contrary.

The court also notes that the Opinion relied upon by the Defendant (Ct.Rec. 19) was a pre–*Taggart* decision filed on September 30, 1991. *Taggart* was decided on January 9, 1992. The court did not find that the complete failure to control or to arrest the released inmate, as well as the failure to warn and/or protect a foreseeable victim of a reasonably foreseeable danger from the dangerous informant, who had absconded and violated the specific terms of his release and was not acting as an informant at all, falls within the discretionary function exception to liability. The court, in its September 30, 1991 opinion, held to the contrary, and the court reaffirms that holding after hearing the evidence.

The court finds that the Public Duty Doctrine does not excuse the conduct which occurred here. *Taggart* clearly holds that the State of Washington and its employees who take charge of a parolee, assume the duty to protect against reasonably foreseeable dangerous propensities of the parolee. Therefore, federal agents and the federal govern-

ment are liable under the FTCA, under even more egregious circumstances, for the same conduct. *Taggart* further establishes that a claim against a state parole officer to protect against known dangerous propensities of a parolee is not protected by the public duty doctrine. The federal agents herein involved were under similar duties.

*Proximate cause*

■ The Government also argues that the alleged negligence of the INS officers in failing to warn anyone of Lopez having absconded and reportedly being in the Brewster area, was not the proximate cause of Ms. Marin's death, in that both Ms. Marin and the Police Department were allegedly aware of Lopez's presence in Brewster.

The court has found that the Brewster Police Department was unaware of Lopez's return, and even if the court had found they were so aware, the local officers were without any authority or direction from the federal agents to apprehend Lopez. Likewise, the court has found that the Government failed to establish that Ms. Marin knew of Lopez's return to Brewster. Even if the Government had established such a fact, Ms. Marin had not been informed of the conditions imposed on Lopez; was unaware he was subject to arrest by federal officers; and had no knowledge as to the dealings of the Government with Lopez, including a restriction on his return to Brewster. Any complaint to the local police would have availed Ms. Marin of nothing, since no action had been taken by the Government agents to subject Lopez to apprehension and arrest and the Brewster Police were likewise completely uninformed as to the Government's relationship with Lopez.

The court finds that the failure of the Government agents to take any action at all to apprehend Lopez, or to warn and advise the Brewster Police and Ms. Marin, together with the failure to advise Mr. Beatty of Lopez having absconded and returned to Brewster, were proximate causes of the death of Ms. Marin.

The *Taggart* court also addressed the proximate cause argument:

In Sandau, the State argues that neither the cause in fact requirement nor the legal causation requirement is met. The cause in fact requirement is not met, says the State, because it would be wholly speculative to find that any act or omission of the State or its agents led to Sandau's injury. We disagree. We recognize that when the connection between a defendant's conduct and the plaintiff's injury is too speculative and indirect, the cause in fact requirement is not met. *Walters v. Hampton*, 14 Wn. App. 548, 543 P.2d 648 (1975) (holding that failure of police to prosecute a person who later shot the plaintiff was not the factual cause of the plaintiff's injury.) We do not believe that this is such a case. Here, a reasonable jury might conclude that if the Washington officials had issued the parole warrant the day they received a teletype from the Montana authorities informing them that Montana police were standing by to arrest Geyman, Sandau never would have been raped....

The State argues that the legal causation requirement is not met in Sandau because the State cannot monitor parolees to the extent that would have been required in order to prevent Geyman from harming Sandau. We can not accept the assertion that Geyman's parole officer, Kairoff, would have had to monitor Geyman more intensively than state resources allow in order to have prevented the attack on Sandau. Before the assault, Kairoff knew that Geyman was in violation of the conditions of his parole.... The information the State needed in order to determine whether Geyman should be arrested, as well as a convenient means to arrest him, were thus readily available. No minute-by-minute monitoring were required.

*Taggart, supra* 118 Wash.2d at 227, 822 P.2d 243.

This court concludes that, had the INS agents taken appropriate action to warn Ms. Marin and the Brewster Police of the conditions of Lopez's release, of his having absconded therefrom, and of his liability to arrest, Ms. Marin would not have been murdered. Those failures were a proximate cause of Ms. Marin's murder. The court is satisfied that if appropriate action had been taken by the Government agents, Lopez would have been apprehended prior to the murder.

## CONCLUSIONS OF LAW

The court is satisfied that the reasoning of *Taggart* is applicable here, whether the claim is stated as a negligent failure to warn, or negligent supervision. The court finds that the INS agents failed to fulfill their duties to supervise Lopez, failed to warn Ms. Marin and/or the Brewster Police Department, and failed to take any action to apprehend Lopez. Those failures were a proximate cause of the murder of Ms. Marin by Lopez.

Based upon the foregoing, IT IS HEREBY ORDERED that the estate of Maria Marin–Bobadilla is entitled to recover judgment against the United States of America in the amount of $179,305.65. Additionally, Alfredo Marin, as guardian, is entitled to recover judgment against the United States of America in the amount of $600,000, being $200,000 each for the benefit of Robert Vargas Marin, Victor Vargas Marin, and Jose Luis Vargas Marin, minor children of Maria Marin–Bobadilla, together with the Plaintiffs' costs and disbursements herein incurred.

IT IS SO ORDERED.